Jaan LAAMAN et al.

v.

Raymond A. HELGEMOE, Warden New Hampshire State Prison, et al.

Civ. A. No. 75–258.

United States District Court, D. New Hampshire.

July 1, 1977.

Richard A. Cohen, and Bjorn R. Lange, New Hampshire Legal Assistance, Concord, N. H., Robert E. K. Morrill, Hall, Morse, Gallagher & Anderson, Concord, N. H., for plaintiffs.

James L. Kruse, Asst. Atty. Gen. and Richard B. McNamara, Concord, N. H., for defendants.

## OPINION

BOWNES, District Judge.

This civil rights action brought under 42 U.S.C. § 1983 concerns the living conditions and programs available at the New Hampshire State Prison (NHSP). It is brought by twelve named inmates on behalf of all persons who are or will be incarcerated as duly convicted felons at the prison, including, but not limited to, inmates on work release, in quarantine, punitive segregation, protective custody and on trusty status. The original defendants, sued in both their individual and official capacities, were the Warden, Deputy Warden, Prison Physician, and members of the Board of Trustees of New Hampshire State Prison. The case is proceeding against the present Warden, Prison Physician, and incumbent members of the Board in their official capacities only due to the dismissal of the case against them in their individual capacities. Authority is conferred upon the Warden and the Board of Trustees by NH RSA 622:2 and 622:5 respectively. Jurisdiction is conferred by 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202. This court's findings of fact and rulings of law are incorporated in this opinion as appropriate under F.R.Civ.P. 52.

The suit was originally brought by plaintiff Laaman on August 29, 1975, challenging defendants' emergency lockup of the prison. He claimed that the lockup and the subsequent prisonwide search or "shakedown" had been instituted without a basis in fact and in bad faith, that the search had been conducted in an illegal manner, that noncontraband personal property had been confiscated by defendants, and that he was being denied visits in violation of his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

The court appointed counsel, and the case mushroomed into a broad-based attack on the general living conditions at the prison. On June 15, 1976, plaintiffs' motions to consolidate and amend the complaint were granted, and this case was certified as a class action pursuant to F.R.Civ.P. 23(a) and (b)(2). Henceforth, the case concerned not only the lockup, but the medical care, work, education and rehabilitation opportunities, visitation and mail privileges, and a general attack on the conditions of confinement at NHSP. The complaint also alleged harassment of the named plaintiffs. On December 30, 1976, defendants' motion for dismissal and/or for summary judgment was granted in part, and the case went to trial February 22, 1977, on the remaining allegations.

In my ruling on defendants' motion for dismissal and/or for summary judgment, several of plaintiffs' contentions were dismissed under F.R.Civ.P. 12(b)(6). I ruled that the good faith or bad faith of prison officials in instituting a prisonwide lockup is outside the purview of the federal courts as the "discretion of prison authorities in what they deem to be an emergency" is "unreviewable," and I dismissed all claims concerning the institution of the lockup. *Hoitt v. Vitek,* 497 F.2d 598, 600 (1st Cir. 1974). Plaintiffs' allegations concerning the searches and seizures during the lockup survived defendants' motions; however, except as to the question of whether or not the search itself was conducted in such a wanton manner as to be unreasonable in violation of plaintiffs' rights under the Fourth and Fourteenth Amendments, plaintiffs' claims are severed from the case to be referred to a master. *United States v. Savage,* 482 F.2d 1371 (9th Cir. 1973), cert. den., 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491 (1974); *Daughtery v. Harris,* 476 F.2d 292 (10th Cir.), cert. den., 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *United States ex rel. Wolfish v. United States,* 428 F.Supp. 333, 341–42 (S.D.N.Y.1977); *Hodges v. Klein,* 412 F.Supp. 896 (D.N.J.1976); *Bijeol v. Benson,* 404 F.Supp. 595 (S.D.Ind.1975).

See Giampetruzzi v. Malcolm, 406 F.Supp. 836, 844–45 (S.D.N.Y.1975). Plaintiffs' claim that a single visit per week constitutes a deprivation of their First Amendment right to freedom of association was dismissed for failure to state a cause of action. Craig v. Hocker, 405 F.Supp. 656, 674 (D.Nev.1975). See McCray v. Sullivan, 509 F.2d 1332, 1334 (5th Cir.), cert. den., 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); Walker v. Pate, 356 F.2d 502 (7th Cir.), cert. den., 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678 (1966); Pinkston v. Bensinger, 359 F.Supp. 95 (N.D.Ill.1973); Rowland v. Wolff, 336 F.Supp. 257 (D.Neb.1971). Finally, the court dismissed all plaintiffs' allegations concerning actual medical treatment received by individual inmates on the basis that they stated no constitutional deprivation but only possible torts. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

## THE PLAINTIFF CLASS

As a class, the NHSP inmates are a remarkably homogeneous prison population. The approximately 280 inmates are almost exclusively white; they are young, and most are first time felony offenders serving sentences significantly shorter than the national average. The percentage of them convicted of violent crimes is less than the national average. As a group, they have poor work records, few skills and little education. Many have or have had severe drug and/or alcohol problems, and between 10% and 35% suffer from serious psychological impairments which require some form of treatment.[1] The experts testified that, because of the homogeneity of the population and its rather obvious needs, and the small size of the prison, it should be a relatively easy institution to run. It should be noted that the racial strife which engulfs so many of the nation's penitentiaries is simply not a

factor here. Tes. Nagel, Fogel, Rundle, Brodsky; Ex. 13A at V–13 to V–15: Ex. 13B at V–6 to V–8; Ex. 15 at 65, 90, 98; Ex. 43 at 2, 24.

## THE PHYSICAL PLANT

NHSP is located in the City of Concord, New Hampshire, thus making urban support services available. It is a typical 19th century, Auburn style institution: a walled, maximum security penitentiary dominated by a free standing, three-story block of back-to-back cells. It was built in 1878, and no major renovations were done until the 1940's when a modified Auburn cell block was added, increasing the prison's size from 248 to 314 single cell units. Ex. 13A at IV–2: Ex. 13B at IV–2.

The Central Control Building is the hub of the prison with the Main Cell Block, the South Wing, the West Wing, and the Administration Building jutting off it. It houses the inmate reception and processing services, part of the inmate dining and kitchen areas, some administration offices, the visiting room, and the gym-chapel.

The South Wing contains much of the inmate kitchen and dining area, classrooms, counselling rooms, and the Warden's office, with the mental health facilities secluded on the third floor.

The West Wing houses the medical care unit and the isolation cells. The ground level contains the water heating system for the prison, a nonfunctional boiler, and six isolation cells. A single rail catwalk around the perimeter of the boiler room is the major access route to the cells and is unsafe according to accepted minimum standards. Ex. 13A at IV–30: Ex. 13B at IV–28. Beyond the cells were the inmate showers which, since this litigation began, have been

---

1. The expert testimony concerning the incidence of mental illness at the prison was based on national statistics concerning prison populations in general and not upon specific information concerning NHSP. This is due at least in part to defendants' failure to adequately diagnose the plaintiff class so that no records exist.

I accept as a matter of fact that the national statistics reflect the incidence of mental illness at NHSP and that, as a probability, the incidence of severe psychological impairment is higher in the prison population than in the outside population. See Tes. Brodsky, Rundle, Payson. See n. 5 at 35.

replaced with new facilities.[2] On the second floor of the West Wing are the psychiatric isolation cells, a classroom, and storage space. The third floor houses the medical and dental facilities.

The North Wing is the Main Cell Block. The structure is three stories high and contains a cell block of four layers of cells, free from the outside walls of the building. The ground floor cells open to the first floor, while the second, third, and fourth layers are connected by wooden tiers edged with steel mesh security screens. The front wall of each cell has a barred door and window with a pass slit at the sill. As there is no central lock system in the Main Cell Block, each cell must be individually locked and unlocked by a correctional officer. Stip. 133.

Each cell measures 6′ × 8′ and contains a toilet bowl, sink, bed, and miscellaneous furniture. The lighting both inside and outside the cells is inadequate. The heat is uneven, and the inmates complain that some cells are excessively hot while others are too cold in both the winter and summer. The cell block is heated by wall radiation units located on the ground floor. An air circulation system has been installed since this litigation commenced, but the court noticed little improvement on its tour.

The cramped and dingy space, the plumbing, heating and lighting problems make the cell block a difficult place in which to live. The situation is aggravated by the continuous din, broken windows, and the lack of screening. Sanitation is a continuing problem, but the parties noted a distinct improvement in the cleanliness of the cell block between late last year and the time of trial.

The supplemental cell block, the Annex, is affixed to the Main Cell Block at the north. It houses the trusties, protective custody inmates, and those in quarantine and punitive segregation. Conditions in the Annex for protective custody inmates were litigated in *Nadeau v. Helgemoe,* 423 F.Supp. 1250 (D.N.H.1976), and will not be extensively covered here. The Annex has three levels of steel plate, back-to-back, single cells with each level separated by a concrete floor. The cells measure 6′ × 8′ and are equipped with a combination toilet-lavatory unit, a cot or steel bunk and miscellaneous furniture. Single showers are being installed on each tier. The ventilation and lighting are inadequate. The ground floor of the Annex contains the prison library and some shower units.

The Recreation Hall is a separate one-story building located west of the South Wing and separated from the main yard by the Hospital Wing. It is equipped with picnic tables, a pool table, Ping-Pong equipment, and one television set. The toilet facilities are exposed to view. In the words of defendants' consultants:

> [l]ittle value for its assigned purpose can be found in this facility. There seems to have been so little effort and money expended to make this building a pleasant place that if given a choice, a number of prisoners would probably opt for the comfort of their own cells instead of spending their time here. Ex. 13A at IV–41: Ex. 13B at IV–39.

The prison industries are housed in a separate building across the yard from the Main Cell Block. The building contains some recreational and storage space as well as the prison's functioning boiler. The laundry service, the boiler, and the inmates' weight lifting room are all located in the basement. The prison's industrial shops and the canteen occupy the next two floors.

The automotive school is in the North Yard outside the presently occupied area of the prison but within the perimeter of the outside walls. The building and equipment are more than adequate. A new building, which will be used for the repair and maintenance of State vehicles, is being constructed next to the auto school. This building will have sufficient space and facilities for its intended use.

---

**2.** This court will not detail the infirmities of the old showers as all parties agree that they were grossly inadequate.

The main yard, which is used for recreation, totals just over two acres, excluding buildings, but only some of this area can actually be used for organized sports. The yard is large enough for softball games, but too small for either football or hardball. There is an adequate outdoor basketball court. Tes. Nagel; Stip. 123.

## SPECIFIC FACILITIES

The kitchen, isolation cells, recreation facilities, medical facilities and visiting room are specific objects of the court's scrutiny. Plaintiffs assert that the inadequacies in these areas not only contribute to the overall constitutional deficiency of NHSP, but are themselves so shockingly inadequate as to offend notions of common decency.

### 1. *Food Service*

Defendants have recognized the serious state of disrepair of the kitchen, and major renovations and replacements are currently being undertaken. Such action was obviously necessary. Nevertheless, I must discuss the facilities as they existed at the end of the discovery period of the litigation, as this portion of the opinion is concerned with findings of fact.

The food service facility is located on the ground floor of the South Wing. It includes a kitchen, bakery, dishwashing area, food storage space, a butcher shop and walk-in meat, dairy and bakery refrigerators and freezers. The area is old and in a state of serious disrepair. Neither the floor construction nor the drainage in the kitchen area are adequate for the maintenance of proper sanitation. Exposed overhead sewer lines run the length of the food preparation and service area, and potable water pipes cross the waste disposal lines creating a danger of sewage contamination of the food and water. Open sewer drains in the kitchen floor are unclean, and poor traps result in the accumulation of sewer gas. The toilet facilities are insufficiently separated from the food preparation area. These conditions create serious health hazards. Tes. Gordon, Oakman; Ex. 15 at 76; Stips. 151, 193.

Utensils and kitchen equipment, including the hood of the range, are not properly cleaned, and much of the equipment is broken and dented. While some of the damage was a result of the 1975 Christmas Day Riot, I note that one study, predating the riot, found the equipment "antiquated, poorly organized and difficult to keep clean." Ex. 15 at 76. Stip. 181; Ex. 21.

The kitchen area is infested with rodents, cockroaches and other insects. Broken windows and inadequate screening augment the basic insect problem, and "fly sticks" with gross accumulations of dead flies hang in the kitchen. Ventilation is inadequate, and, in order to increase it, the personnel often keep a back door open which allows insects, rats and mice to enter the building. While some efforts have been made to combat the rodent infestation, in the words of defendants' expert, "pest control cannot be effective until they control solid waste." Tes. Oakman. Due to the lack of ventilation, volatilized grease from the stove spreads throughout the kitchen, accumulating with dirt and thus aggravating the basic hygiene problem in the food service area. Tes. Gordon, Oakman; Stip. 178.

The refrigerators and freezers are dirty. The walls are constructed of rough, porous surfaces which are difficult to keep clean at best, but the experts testified that in neither November nor February was there any evidence of recent cleaning. To the contrary, at both times molds were growing on the walls. Food is not properly stored, and some is placed unwrapped and uncovered on the floors of the freezers and refrigerators. Food and nonfood items are mixed together on the shelves, and frozen food is improperly thawed before cooking. Tes. Oakman, Gordon.

The butcher shop is unsanitary. The meat cutting board is old and cracked and, as a result impossible to clean properly; both plaintiffs' and defendants' experts agree that it must either be resurfaced or replaced. The shop is not properly cleaned, and pieces of unused meat and fat accumulate under the butcher table. Tes. Gordon, Oakman. *See* Ex. 21.

Since defendants have begun major renovations of the kitchen area, food preparation has been moved to temporary facilities, which both plaintiffs and defendants recognize constitute a health hazard. The worst factor is the ventilation of the temporary kitchen which is "very inadequate, resulting in excessively hot and humid conditions." Ex. 39 at 2. On the court's view, the temperature was over 90°. Furthermore, basic sanitation practices are still not being observed. There is exposed garbage and standing water, an open invitation to rodent and insect infestation. Tes. Gordon, Oakman.

While plaintiffs and defendants differed on the maximum temperature attained by the mechanical dishwasher, both defendants' figure of 172° and plaintiffs' of 150° are below the acceptable minimum of 180° necessary for proper sterilization. Tes. Gordon, Oakman; Ex. 21.

The inmates who work in the kitchen are not given physical examinations before or after their assignment to kitchen duty, and there seems to be no check at all on the health of those handling food. Neither cover clothes nor hairnets are utilized by those working with or near the food. Cigarette butts, soiled clothing, and boots seem to be an indigenous part of the kitchen. Tes. Wallace; Ex. 21; see Ex. 13A at III–84: 13B at III–70.

The kitchen and dining areas were continuously dirty and unsanitary until July, 1976, when there were significant improvements. Stip. 177. However, according to defendants' consultant, in October, 1976, "[s]anitation standards [are] so low that the institution was actually filthy in many areas . . . ." Ex. 12 at 2. I note that the dirty and unsanitary conditions have persisted for years despite repeated orders by prison administrators that the kitchen was to be scrubbed down daily. See generally Ex. 21; Ex. 53: SOP # 80.

## 2. The Isolation Cells

There are three groups of types of isolation cells at the prison: the "West Wing" or "solitary confinement" cells; the "psychiat-ric" or "treatment" cells; and the "hospital" or "death" cell. All are located in the West Wing.

The seven solitary confinement cells are in the basement of the West Wing, next to the defunct boiler and the institution's water heater. Each $4\frac{1}{2}' \times 8'$ cell has a barred door and a solid steel door with an observation window measuring $2'' \times 4''$. Four of them are equipped with a toilet-sink combination affixed to the wall about two feet off the ground. The three dry cells are not used. There is no hot water. No cell has any lighting or windows inside, and bare light bulbs illuminate the small hall in front of the cells. With no fresh air source and no way for air to circulate, there is no ventilation at all.

Inmates placed in solitary confinement are stripped to their underwear or left naked if they wear none. No beds are provided and only a canvas mattress and, sometimes, a blanket are issued to the occupant. One inmate testified that he was stripped and denied both a blanket and a canvas mattress. He spent several nights tossing and turning on the the freezing concrete trying to keep warm. Others did not receive blankets. All the inmates complained of the temperature; it was either extremely hot or cold. When it was too hot, the heat "baked in the dirt on your feet," and, when it was too cold, sleep was impossible. Temperature estimates varied from the 60 °'s to the 90 °'s. Tes. Vayens, Houman; see Stips. 68, 251.

According to the experts, the single worst factor about the West Wing cells is their complete and total isolation. Five layers of steel and a considerable distance separate an occupant from the rest of the prison. No guard or any other person is posted in or near the area, and the cells are not checked regularly. Only the guard who brings the meals is a sure visitor, and were an inmate to scream for help at any other time, no one would hear. Adequate procedures require frequent visits by someone with some mental health training. Tes. Fogel.

The inmates are given noting to do and, as a result, resort to various disruptive antics such as plugging the toilets and flooding the cells or abusing their bodies to attract attention or to help the time pass. In one inmate's words, they were "treated like animals and acted like animals, yelling and screaming." Tes. Houman.

The reasons for which inmates were placed in solitary varied from punishment meted out after a disciplinary hearing to control of disruptive behavior. One inmate was put in solitary despite the fact that he was a known epileptic.[3] There was an instance of an inmate isolated because of an attempted suicide, who smeared his wounds with his own excrement and then plugged the toilet. After a time, he and the cell were cleaned up, and he was returned to solitary. Tes. Houman.

The combination of the total and devastating isolation, the inadequate lighting, ventilation, plumbing, size, and the uncontrollable temperatures make these cells "inhumane," "close to the worst I've ever seen," "totally unfit for human habitation," and "the most destructive solitary unit I've ever seen." Tes. Fogel, Nagel, Gordon, Rundle. The only comparison is a medieval dungeon. The almost unanimous opinion of the experts was that such stringent isolation is both a psychological and a physical horror with the potential of devastating psychic, emotional and physical damage. They recommended that the West Wing solitary cells be sealed off and never used again for any purpose at any time.

The "death cell" is on the second floor of the West Wing. It was originally designed as an isolation unit for a condemned man just before his execution. Its name and original purpose is bound to have a deleterious psychological impact upon its occupant. It is a small dry cell with no amenities. It is poorly lit and ventilated. It is dirty and unsanitary, and there was testimony that it would be impossible to clean adequately. There is no furniture whatsoever in it, although some inmates said that when confined there they had been provided with a foam mattress. The cell is also far removed from either medical or custodial supervision; an inmate calling for help could not be heard. Tes. Fogel, Nagel, Gordon, Rundle.

The "death cell" is sometimes used for disturbed inmates. At least one expert testified that he had seen a clearly psychotic inmate lying passively in his own filth. Tes. Rundle. The prison's consulting psychiatrist said that several inmates placed in the "death cell" after suicide attempts had been able to get razor blades from other inmates while they were in isolation. Tes. Payson; Stip. 15.

Finally, there are the "treatment" cells, also located on the second floor of the West Wing. They have been variously described as "steel tombs," "box car cells," or "bank vaults." They have solid walls, no windows, and only a narrow opening for food. Of the five cells, one is padded, although inadequately, making it useless in terms of keeping an inmate from hurting himself. The rest are furnished and have adequate amenities. Like the other isolation units, the "treatment" cells are isolated from the rest of the prison and are insufficiently supervised.

The "treatment" cells are presently being used to house some protective custody inmates who have asked to be placed there. The doors to the cells are unlocked so that the inmates are free to visit with each other.

The experts concurred that the use of isolation for disturbed inmates violates all modern treatment practice and is potentially psychologically destructive and physically dangerous. Disturbed persons need, at a minimum, to be observed and not to feel isolated and abandoned. Isolation is counterproductive in terms of treatment and dangerous even to a healthy person. The experts agreed that, even under the best of circumstances, it would be a hazardous

---

3. The epileptic inmate was removed from isolation only on order of this court, *see* Civil No. 75–93, *Vayens v. Helgemoe.*

practice to use any of these cells, and urged that they be closed permanently.

### 3. The Visiting Room

The visiting room in the Central Control Building is small and uninviting. It is furnished with long wooden tables and unpadded wooden chairs. While there are no physical barriers to impede conversation or to prevent personal contact, the tables are wide enough to effectively circumscribe the inmates' ability to touch their visitors or to speak with them privately. There is no separate private room for attorney-client consultations. Stips. 125, 126; *see* Stip. 496.

### 4. Gym

Above the visiting room is an area of approximately 2,500 square feet, which is used alternatively as the prison's only gymnasium, chapel, and theater. Portions of this limited space are taken up by a stage and a storage section for religious equipment. The ceiling is not acoustically designed for religious, theatrical or lecture use and does not muffle the noise produced during the athletic activities of the inmates. Consequently, the use of the gym has been restricted to three nights per week so as to minimize disturbance of visitations taking place directly below. Stips. 135, 136, 139.

### 5. Fire Danger and Emergency Exits

One final and important aspect of the physical problems at NHSP is the lack of emergency exits, evacuation plan or fire prevention equipment. A dangerous situation is created by the dearth of equipment and emergency exits, the combustibility of portions of the prison, and the lack of staff training for emergency evacuation. To compound the situation, inmates are allowed to purchase and retain lighter fluid. This not only presents a danger to individual inmates and staff, but could enable prisoners to "ignite a blaze of major proportions in numerous vulnerable areas about the institution." Ex. 13A & B at III–42.

A serious fire hazard in the cell block was noted by defendants' consultant.

The age of the structure, numerous coats of paint on the walls, wooden catwalks and inmate possession of lighter fluid all serve to contribute to a hazardous fire situation. In the event of a serious fire, the requirement to individually unlock each cell door with a key could easily result in a loss of life disaster of most serious proportions. Ex. 13A & B III–13.

The ceiling, roof, and catwalks are all constructed, at least in part, with timber. The building is sprinkled. There are exits only at the north and south ends of the cell block, and those lead into other parts of the prison. Emphasizing the heavy reliance on "the actions of the prison officers to facilitate evacuation," defendants' consultant concluded that "the personal safety of the inmates is all but ignored." Ex. 13A at III–55–56: Ex. 13B at III–53–54. *See* Ex. 13A at III–13, IV–33 to IV–36, IV–55 to IV–56: Ex. 13B at III–13, IV–31 to IV–34, IV–53 to IV–54.

The Central Control Building is sprinkled throughout, but there is no emergency exit to the exterior except through keyed doors or through barred windows to an adjacent roof. Most significantly, the only exit from the gym-chapel on the third floor is limited to a narrow wooden stairway. Ex. 13A at IV–20 to IV–23: Ex. 13B at IV–18 to IV–21.

The West Wing does not have a sprinkler system. Exit from the third floor is only possible by the single stairway to the second level; there is no emergency exit. The stairway poses special problems for non-ambulatory patients because of the difficulty of negotiating the stairs with a stretcher; the situation would be dangerously aggravated in case of an emergency evacuation. There are only secured doors to the exterior from the second floor. Ex. 13A at IV–28 to IV–34: Ex. 13B at IV–26 to IV–34.

While the South Wing is equipped with sprinklers, the building itself is partially constructed of flammable materials, and combustibles are stored in the attic which

has no fire or smoke detectors. Access to the third floor is solely by a narrow wooden staircase, and there are no emergency exits from either the second or third floors. Ex. 13A at IV–24 to IV–28: Ex. 13B at IV–22 to IV–26.

The Annex does not have a sprinkler system, and the fire fighting equipment is behind locked bars; however, the building is not combustible. There are exits to the main prison yard, the front yard and the Main Cell Block, all from the bottom level. Ex. 13A at IV–36 to IV–38: Ex. 13B at IV–34 to IV–36. The Main Entrance Building is combustible but contains sprinklers. The only door to the exterior remains locked so that emergency exit from this building would have to be through an adjacent part of the prison. Ex. 13A at IV–17 to IV–19: Ex. 13B at IV–15 to IV–17. The Administration Building is not sprinkled, has no fire alarm system and is combustible. The emergency exits are adequate except that some are kept locked. Ex. 13A at IV–11 to IV–16: Ex. 13B at IV–9 to IV–14. The Recreation Building is combustible, is not sprinkled and access to it is by an awkward sliding door. While the Industries Building has free egress, the stairways from the upper floors are remote and there is only one from the fourth floor. In some cases, they are built of combustible material, and many flammable items are stored in the Industries Building. Ex. 13A at IV–56: Ex. 13B at IV–54.

On my view, I noted that there are some fire extinguishers at NHSP, but that many of them have not been checked for some time, one as long ago as 1972. The distribution of extinguishers seemed to have little to do with the location of high risk areas in terms of fire hazard as described by defendants' consultant or as observed by this court. Furthermore, some of the extinguishers are contained in locked areas, inaccessible to anyone without a key, while others are kept within easy reach of both inmates and officials.

While the staff are presently receiving some classroom training in emergency evacuation, in February, plaintiffs' experts found the staff generally unaware of the existence of any plans for evacuation. There had been no practice training for the management of large-scale crises at NHSP and, while the employees are now being taught how to deal with a critical situation, no written plan has been distributed to the inmates. Tes. Ash.

In summary, the physical plant is antiquated and dilapidated. It is not maintained properly, and its facilities are inappropriately utilized. The combined impact of unplanned development and expansion of the institution, shifting penological philosophies and the concomitant changes in the institution's programs, the lack of upkeep and ineffective use of what the plant can offer, results in a prison outdated, misused and dangerous to the lives of both the keepers and the kept.

## THE DAILY ROUTINE

The day begins at 5:00 o'clock for the inmates who prepare breakfast. The electric power goes on at 6:00. The farm trusties eat their breakfast before the general population who eats at 7:00. Inmates assigned jobs report to the shops at 7:30 and work until an early lunch is served at 11:20. They are locked into their cells at 11:45 for the noontime head count and report back to work at 1:00 P.M. Yard time begins at 3:00. The evening meal is served at 4:20, and the evening head count takes place at 5:00, at which time mail and medications are delivered. The inmates again have yard time until 8:00 o'clock when evening activities begin, and some of the Annex population is released into the yard. The final head count is at 9:30 P.M.

In 1977, the total cell time for the general population is between twelve and thirteen hours per day as compared to 1965 when the inmates spent between fifteen and sixteen hours a day in their cells. Between 1965 and 1977, the inmates' yard time increased from approximately one hour daily to just over four hours per day. Ex. 49; Ex. 52; Ex. 53, SOP # # 39, 57, 68.

## QUARANTINE

An inmate's first contact with NHSP is during "quarantine." While "quarantine" is really a medical term, here it denotes a period of mutual orientation between the new inmate and the institution.

Defendants describe the quarantine procedure at NHSP as follows. The doctor and the dentist see every new inmate within seventy-two hours of his arrival. The doctor takes a medical history of the patient, does a routine physical examination, takes a blood test, and does other laboratory procedures if warranted. The examination normally takes between fifteen and thirty minutes. The Treatment Division of the prison conducts an initial classification interview, a complete psychological evaluation and a social work-up. The information thus garnered, presentence material and the inmate's criminal record are submitted to the Work Board Classification Team which assigns a security classification, a treatment designation and a job to the inmate. Pictures and fingerprints are taken during quarantine. The inmate is given the prison's written rules and regulations which are orally explained to him within a week of his arrival. Ex. 31; Tex. Clarke, Piela.

The reality of the quarantine period is quite different from its formal outline. While it is not supposed to last for more than fourteen days, some inmates have been held in quarantine up to a month, and one expert testified that the quarantine cells looked as if they had been lived in for years. Because of some administrative mix-ups and difficulties, some prisoners were in quarantine for an unnecessarily long time, but defendants aver that the situation is now improved. Tes. Fogel, Clarke.

From plaintiffs' eyes, quarantine at NHSP is "dead time." According to the inmates, they were let out of their cells only for meals and a shower once a week, although one inmate testified that he was allowed to exercise one hour a day. Inmates were sleeping when plaintiffs' expert visited at approximately 10:00 o'clock in the morning. Tes. Fogel, Nagel, Jacques, Roy, Meade.

Medical attention during quarantine is scant at best. Some inmates said that they never saw a medical staff member the entire time in quarantine, and only one said that he had seen the doctor within the prescribed seventy-two hour period. Those who did see the doctor uniformly testified to the inadequacy of the medical attention they received. One inmate was given a tine test for tuberculosis, but there was no follow-up. In another examination, the doctor merely looked at the inmate's mouth and fingers and dismissed him. In some cases, the doctor neither asked any questions of the inmate nor evinced any interest in medical problems or history when the information was volunteered. In one case, the inmate stated that the doctor never asked him anything about stomach problems or diet, yet put into his medical record that no special diet was necessary. Another inmate testified that he had been going through withdrawal from a prescribed drug when he arrived at the prison but was unable to see the doctor even though he tried. Not only was there no routine physical examination, but he was unable to renew his prescription or get other relief for his withdrawal symptoms. The doctor's notes of these physical exams are very brief. Ex. 40H; Ex. 3; Tes. Fogel, Meade, Roy, Jacques, Wallace, Laaman.

Of the inmates who testified, most had been visited and interviewed by personnel from the Mental Health Division, three had been tested, and one saw the psychiatrist for four to five minutes. One saw a social worker approximately once a week, and another inmate voluntarily began counseling with the Mental Health staff within one week of his arrival at NHSP. Tes. Farnsworth, Meade, Roy, Jacques. Only two received a copy of any rules and regulations; one received them on his first trip through the prison in 1973, but did not get any his second time around in 1975, and the other got an old set of rules but stated that "it didn't seem like anyone paid any attention." In any case, it makes little difference whether or not the inmates get the rules

because the staff neither receives nor is familiar with them. No inmate received a tour of the library, a security or custody orientation or even any explanation of what constitutes acceptable or unacceptable conduct or of how the canteen operates. One inmate saw the chaplain, but only because the chaplain was in the Annex visiting someone else. All inmates were photographed and fingerprinted. Tes. Farnsworth, Meade, Roy, Jacques, Fogel.

The experts explained the purpose and effect of a quarantine period. None of them disagreed with the need for an initial period of isolation. It allows a person entering a prison, who naturally feels a great deal of anxiety, to ask questions, talk about his fears, learn the ropes, and adjust to institutional life. The isolation period also allows the various prison services to evaluate the new inmate, to plan how best to integrate him into the prison, to "soft sell" their programs, and to inculcate him with some of the things he will need to know to acclimate to life in prison. Thus, the differing needs of the new inmate and the institution can mutually accommodate each other during the quarantine period. Tes. Nagel, Fogel.

In other prisons quarantine programs, new inmates are given extensive diagnostic and medical tests and complete classification work-ups. They are dressed in different clothing for easy identification when they do mingle with the general population. They get written rules and regulations which are then explained to them. Tes. Fogel.

## MEDICAL FACILITIES AND TREATMENT

The function of the medical services and facilities at NHSP has never been defined, and the result is confusion and misunderstanding as to their basic purpose. The facilities and staff are inadequate as either a prison hospital rendering extensive medical care or as a temporary infirmary designed to meet only routine and emergency medical needs.

The medical services are on the third floor of the West Wing. They include a dentist's operating and treatment room, dental X-ray room and laboratory, a private bedroom, one secure six-bed ward, a toilet, a drug storage room, a food preparation room, a treatment room, and a doctor's office and lavatory. There is also a small room that was once used for medical X-rays, but is now used for medical storage. The "space allocated for medical treatment is confined [and] congested." Ex. 13A at IV–32: Ex. 13B at IV–30; Stip. 1. The infirmary has not been licensed by the New Hampshire Department of Public Health since January, 1968. Stip. 26.

As a temporary way station to outside medical attention, the medical facilities are poorly located. A transfer out of NHSP is necessary for any specialized or emergency care or treatment, and approximately 200–250 such transfers occur per year. To get a man from the infirmary to an ambulance or any other vehicle is cumbersome at best; he must be brought from the third floor of the West Wing, across the second floor of the Central Building, to the first floor of the Main Entrance. This odyssey is further burdened by the difficulty with which the West Wing stairs are negotiated with a stretcher. Stips. 80, 82; Ex. 13A at IV–32: Ex. 13B at IV–30; Tes. Prout.

As a hospital unit, the infirmary is clearly inadequate; it barely has the capacity to do routine medical examinations and limited emergency treatment. Stip. 3. Many of the constraints are dictated by the physical location, layout and space allocated to it.

Bed space is limited, but there were no complaints that any inmate had been denied a bed when needed. Unless the situation requires a medical transfer, prisoners are usually treated in their cells, thus obviating a major need for the ward. Furthermore, protective custody inmates are frequently assigned bed space in the infirmary. While this practice was condemned by defendants' experts as "a clear misuse of medical facilities and staff," Ex. 12 at 25, it shows that a shortage of infirmary bed space does not exist at NHSP at the present time.

The infirmary itself is airy and pleasant, but there are no dividers between the six beds so that there is no privacy for the patients. There are no pillows. The linen supply is scanty and the linen storage room is not satisfactory. Patients have access to the linen without regard to the degree of their contagion. Stip. 9; Ex. 14 at 15; Ex. 21; Tes. Gordon, Novak.

The position of the infirmary in relation to the nurse's station was criticized by almost all the experts and defendants' visiting consultants. The beds cannot be seen from the station, and there is one bed that is not visible from the door of the infirmary. The medical facilities are equipped with neither an intercom nor a call system. On my view, the door to the ward was locked, even though there was a patient inside. A person sick enough to be in an infirmary needs almost constant monitoring and care, which is practically impossible under the present conditions and procedures. Ex. 13A at III–101: Ex. 13B at III–86; Tes. Prout, Novak, Gordon.

The examination or treatment room is, at 80 square feet, "too small for a physician to render care such as suturing lacerations and applying casts. This room appears to be equipped to render first aid and very limited medical procedures." Ex. 21. It is less than the minimum recommendation for a medical examination room. It has been suggested that the storage room, which is slightly larger, be converted into a treatment room. Ex. 21; Tes. Payson, Gordon.

The infirmary kitchen is small, cluttered, "old, unsanitary, and under-equipped." Ex. 15 at 77. Defendants have recognized that it is less than satisfactory and are not using it as a kitchen at this time. There is also no secure place for records, and pharmaceutical supplies are not securely kept. There are no X-ray or laboratory facilities at all and little space for storage. Ex. 21; Ex. 13A at III–100: Ex. 13B at III–85 to III–86; Tes. Gordon, Oakman, Payson.

The medical staff consists of one full-time dentist, one part-time psychiatrist, one full-time physician and three full-time nurses. The physician is over seventy-one years of age. There are no male nurses on the staff. A nurse is present at the institution between 7:00 A.M. and 11:00 P.M. seven days a week, and one is "on call" during the night shift. With this staff, no provision can be made for vacations or sick leave; if a nurse is out sick, the prison is without a nurse for the duration of her illness. With the nighttime medical personnel "on call," the prison guards must determine whether or not an inmate needs medical attention. If so, he calls the nurse on the telephone and she decides, on the basis of what she is told by the officer, whether or not to come to the prison. The doctor has not conducted any staff training sessions, and the only training the prison personnel receive now is the training courses which include some first aid. Tes. Piela, Clarke, Dewey; Stips. 13, 24, 33; Ex. 53: SOP # 8.

While the daily caseload of the doctor is not overly burdensome, his total workload is overwhelming. He sees between fifteen and thirty prisoners a day, but he is on call twenty-four hours a day, seven days a week. He has been called during off-hours between three and thirty times a month for the past two years. If the doctor does not adequately respond to the medical needs of the inmates, it is, in part, because of the workload. Stips. 19, 30; Tes. Payson.

The almost unanimous opinion was that, with the exception of the dental care, the medical staff is insufficient to meet the needs of the prison. At a minimum, the institution should have round the clock nursing which requires five full-time nurses. The doctor, himself, has requested additional staff of two more nurses and two medics in order to provide more counseling and follow-up and to see more patients. Stip. 16; Ex. 13A at III–102: Ex. 13B at III–87; Ex. 15 at 78; Ex. 21; Ex. 35 at 19; Tes. Prout, Payson, Clarke, Novak.

The dental office is, in contrast to the rest of the medical facilities, outstanding, and the services offered the inmates are not only satisfactory but exemplary. The dentist is at the prison five days a week and is on call twenty-four hours a day. There is sufficient space for the three dental chairs,

and there is a separate office for X-ray and lab work. The only complaints are the location of the facility and the lack of an office for the dentist. Overall, the dental program is excellent. Stip. 10; Ex. 13A at III–102 to III–103: Ex. 13B at III–88.

A visiting psychiatrist and a few other medical consultants aid the regular staff. There was considerable evidence of friction between them and the prison physician, and, in the case of a disagreement as to medication, the prison doctor's decision prevails. Stips. 48, 49, 88, 96; Tes. Prout; Ex. 40G; Ex. 51.

The back-up availability of the Concord Hospital would satisfy the prison's needs for medical expertise if the prison physician could make use of its facilities as needed. However, plaintiffs contend that, given the difficulty of transferring inmates out of the prison, the medical services there are inadequate without medical consultants specializing in orthopedics, neurology, neurosurgery and cardiology. Plaintiffs' expert testified that the prison physician is presently unable to respond to some inmates, not only because of his workload, but because he is not an expert himself and does not have experts freely available to him. Tes. Payson.

Medical transfer of prisoners to an outside medical facility is severely impeded by NH RSA 623:1 as amended in 1975.

Any person confined in a county jail, house of correction, state prison, or other place of detention may, under such precautions and for such time and purpose as any justice of the superior court or the governor may order, be temporarily taken by some regular or specially authorized officer from such place of detention because of his own extremely critical illness, or the imminently approaching death, or the funeral of a member of his immediate family, or for such imperative and extraordinary purpose as shall be deemed justifiable and humane by said justice, or the governor, to whom application is made. Whenever any such person so confined by order of a justice of the superior court shall be transferred to the New Hampshire hospital except on order of the justice of the superior court who originally ordered his commitment, the administrator of the institution from which he shall be transferred shall give written notice of such transfer to the justice who originally ordered such commitment within five days of such transfer, and said administrator shall likewise give notice to such justice upon the return of such person from New Hampshire hospital. Whenever such transfer is ordered except by the presiding justice for the county from which commitment was originally ordered, the presiding justice for that county shall likewise be notified of any transfer to or from the New Hampshire hospital.

Authority is usually requested from the Governor of the State and has often taken several days to obtain. However, emergency transfers can and do take place quickly, and, as noted above, over two hundred such transfers occurred last year. Defendants agree that psychotic inmates must be transferred to the state mental hospital because the prison simply does not have the staff to properly deal with them. The experts unanimously found this statute cumbersome and inimicable to the rendering of adequate medical care. Tes. Rundle, Novak, Clarke, Avery; Ex. 13A at III–104: Ex. 13B at III–89; Ex. 14 at 15; Ex. 40B & G; Ex. 51.

The transfer situation is aggravated by the lack of complete medical records at the prison. Specifically, as of June 29, 1976:

Although orders for medication and brief M.D. notes are on file in the inmate's folder, there are no recordings of the following: 1. Medical history, 2. Physical exam, 3. Progress notes indicating reasons for need for medications and progress or regression of the health status of the inmate, 4. Records of administration of medications as ordered by the M.D., 5. Copies of transfer information sent to the Concord Hospital when an inmate is sent to that facility for surgery, and 6. Records of care rendered in the infirmary with exception of brief note on M.D. order sheet.

We were informed that as of two months ago all inmates are seen by the physician and the dentist within 72 hours after admission. Although it appears that this is so, documentation of this activity is scanty in the infirmary. The dentist keeps his own records which we did not view. There are approximately 300 inmates and approximately ½ are receiving medications. Ex. 21.

According to plaintiffs' experts, the records they examined were deficient in the following respects: no basis for medical care was noted; there were no written plans for future treatment; at times, the physician used only an order sheet; he sometimes made judgmental comments in his notes or otherwise displayed a lack of objectivity; finally, the notes contained references to events that had no bearing on the patient's physical or mental condition. Defendants' expert said that the records were disorganized, without sufficient detail and, in general, less than satisfactory; however, he noted that this is a common problem not just encountered in prisons. The court's perusal of the mental health files submitted as an exhibit confirms many of the above observations. Ex. 51; Tes. Payson, Prout, Novak.[4]

To support the experts' testimony, plaintiffs submitted a summary of the medical records of 370 inmates at NHSP. According to plaintiffs, of the 370 records studied, approximately 75% contained no notation of a physical examination, 86% contained no medical history and only 9% contained complete notes on a medical history, a physical examination and a mental health diagnosis. The files of the great majority of inmates would be, therefore, relatively useless to any physician not personally familiar with the patient. Ex. 5.

The experts testified that accurate and complete medical records are essential for adequate health care because they form the basis for later diagnosis and treatment and for judgments concerning the quality of the services received. As such, they can protect the prison and its staff from law suits such as this which challenge the adequacy of the medical treatment rendered. Tes. Payson, Prout.

The access the prisoners have to the medical staff and services is by the "sick slip system."

Sick slips are to be handed to the Duty Officer in the Cell Block at 8:00 a. m. daily by the men going to work.

\* \* \* \* \* \*

The Major's Aide will compile a list in duplicate of all those wishing to see the Doctor or the Dentist, attach the slips to this list, and send same to the Infirmary.

The Doctor and Dentist will review the list, making additions or deletions based on their knowledge of the man making the medical request.

After the Medical Department reviews the list, one copy is to be sent to the Control Room so that those on the list may be called to the Infirmary. Ex. 53: SOP # 35.

The obvious defect in this procedure is that it places several people in positions in which they can exercise discretion as to whether or not to forward the complaint, and the inmates claim that many of their requests remain unanswered. One inmate said that he had been told by the medical staff to return for a checkup, but was never called in despite ten request slips in fourteen days. Another testified that he vomited blood before he was able to get medical attention for his ulcer. Tes. Avery, Boston. This court also takes into account the testimony heard and the findings made concerning the access of protective custody inmates at NHSP to medical care.

The very fact that they believe [that they must cut themselves to get medical attention] . . . and the fact that they believe that they must resort to self-help remedies indicates a lack of confidence so serious that would seem to this court to

---

4. I note that the experts were allowed to see only the records given them by defendants. Tes. Prout, Novak.

be antithetical to any kind of medical treatment. *Nadeau, supra,* 423 F.Supp. at 1259.

While nearly all the inmates testified that they had had difficulties in getting medical attention, the doctor says that he turns down only one or two prisoner requests for medical attention per day. However, he has received complaints from inmates that their sick slips were thrown away or ignored by the custodial staff. Stips. 31, 36. From the evidence, it is obvious that all the sick slips put into the system do not reach the medical personnel.

The experts testified uniformly that the sick slip system is not a good method of access to health care services precisely because it allows essentially medical decisions to be made by custodial officers. It also places nonmedical staff members in a very powerful position vis-a-vis the inmates because the availability of medical attention is so crucial to a person's physical and mental well-being, whether or not medical treatment is, in fact, necessary. Regardless of the validity of the decisions not to see inmates, the lack of response leads them to believe that irrational and arbitrary determinations are being made about their medical needs, and the blame will often come to rest, whether or not true, upon the guards. The system violates the confidentiality that is normally associated with communications between a doctor and a patient. The public nature of the sick slip system may inhibit inmates from revealing the true nature of their ailments. They may be embarrassed or they may wish to avoid the possibility of criminal liability. Finally, because custodians make informal decisions concerning health care, there is often no record at NHSP of an individual's request for medical attention, when and for what reason or what the disposition was. Tes. Prout, Payson, Rundle, Novak.

Defendants have recognized the inadequacies of the sick slip system and have proposed new procedures. Ex. 38.

Defendants' method of distributing medication is hazardous to the health and well-being of the inmates. Approximately 50% of the inmates receive medication, and, until the end of 1976, all medication except injections were delivered by guards who were entirely untrained in medical matters. There is no log of the medications given out. The lack of any record of the distribution makes it impossible to determine which inmate received what medication so that, if a mistake were made, there would be no information to help determine the necessary course of action. Distribution of the medications by untrained custodial officers, of course, increases the possibilities of such errors. Furthermore, delivery of the medicines by guards mixes the custodial and medical roles which should be kept separate. Tes. Prout, Novak; Ex. 21.

The experts and consultants unanimously condemned this practice, and it has mostly ceased. Medications are distributed by nurses to the inmates who must now come to the distribution room to receive it. However, nighttime medications are still delivered by the guards, as are all medications to inmates in the Annex. Tes. Piela.

The prison doctor spends approximately $1,000 per year of his personal income purchasing medication for the prisoners because the budget is inadequate. Plaintiffs complain that this results in inmates receiving only the least expensive drugs, but there was no evidence to support this contention. The supply of drugs is insufficient. There was testimony that large amounts of tranquillizers are prescribed at the prison, but less in February, 1977, than in November, 1976. There is no prison pharmacy, and medications are purchased locally. Tes. Clarke; Stip. 103; Ex. 21.

A prevalent health problem with many prisoners is peptic ulcers, and the common method of treatment is by special diet. Of the approximately one hundred "handicaps" identified by plaintiffs through the doctor's notes, 16% were labeled as ulcers of one sort or another, and an additional 13% were identified as obesity, hypertension or diabetes, all conditions requiring dietary care. As of late 1976, the doctor had issued between forty and fifty special diet cards, which amounts to between 15% and 20% of

the prison population. Stip. 70; Ex. 5; Tes. Prout, Payson.

The evidence is clear that the diet line cards are useless because no special food is prepared for those who need it. There is no dietician at the prison. An inmate who works in the kitchen testified that no special food is prepared unless a particularly hard to digest meal is served to the general population, and then the special diet consists of hamburger. Another inmate testified that he had been eating nothing but plain cereal for the past three weeks because he had been experiencing severe stomach pains and vomiting blood. Other inmates testified to similar, although less dramatic, incidents. The visiting psychiatrist complained that no low fat diet is available for inmates with circulatory diseases or gall bladder problems. Tes. Wallace, Avery, Jacques, Payson; *but see* Ex. 13A at III–84: Ex. 13B at III–70. Permanent damage can occur from a failure to treat peptic ulcers: sometimes even surgery may be required to remove the scar tissue resulting from an untreated ulcer.

## MENTAL HEALTH SERVICES

The location of the mental health unit on the top floor of the South Wing effectively precludes contact with any inmates except those motivated and directed to seeking out the services offered there. The functional isolation of the unit is magnified by the fact that the only access to it is via a stairway so narrow that it is difficult for two people to pass. Casual or spontaneous encounters are unlikely because the contact the mental health personnel have with the inmates is "akin to a mail-order operation." Ex. 13A at III–100: Ex. 13B at III–85.

As of the end of 1976, the staff of the mental health unit consisted of two counselors, one psychologist, and one psychiatric social worker. As of February, 1977, one of the three counselors had been assigned as Supervisor of Work Release and another was Acting Director of the unit; only one is working solely as a full-time counselor, although each is supposed to carry a full caseload. The visiting psychiatrist and a

sociologist are consultants to the unit. There has been a long-term vacancy in the position of Staff Director. In addition, the division's Administrative Assistant has been assigned to the Deputy Warden, and the Manpower Grant which financed the clerk-typist ended in March. At trial, the witnesses did not know whether or not it would be renewed. Two other job positions are vacant, and no one can be hired due to the general governmental job freeze in New Hampshire. At its apex in 1972, the mental health division, then known as the Disturbed Offenders Program, had five full-time and four part-time counselors and a director. Tes. Ingham, Clarke; Stips. 87, 88, 89, 275, 276; Ex. 12 at 33.

The staff is made up of persons with less than full academic credentials for their positions. The full-time counselor has a Bachelor's and a Master's degree in history and has taken some courses in sociology. He does not wish to further his education because of his job's uncertainty due to the funding problems and because of the expense involved. None of the staff has any correctional mental health training. Tes. Brodsky, Ingham.

The purpose of the division has changed over the years and is again in the process of shifting. In 1972, as the federally financed Disturbed Offenders Program, it was designed to identify and treat inmates who were psychologically troubled or who presented severe management problems. Over the years, the emphasis shifted from identification to crisis intervention. In 1975, New Hampshire assumed financial responsibility for the program. Today, the Director of Treatment has titled the program the Diagnostic and Counseling Service Division and is building up its diagnostic capabilities. A revised BETA intelligence test, the MMPI personality test and a "sentence completion" personality diagnostic test are supposed to be administered to all incoming inmates. In September, 1976, the division started taking notes at the interviews and making formal social work profiles and case summaries.

The psychologist and social workers are spending proportionately more time now diagnosing than treating. As of October, 1976, the staff "interpret[ed] their mission to be solely counseling of inmate volunteers," Ex. 12 at 33, but now they are spending less than 40% of their time on treatment and therapy and up to 40% in diagnostic services. Tes. Clarke, Ingham; Ex. 15 at 86–89. However, "counseling" must be broadly interpreted. Even before the recent shift to diagnosis, the full-time staff spent less than 40% of their time actually in therapy sessions with clients and about the same coping with "crisis" situations and acting as in-house functionaries. Crises occur "with a certain frequency" and most are institutionally induced. They include problems with access to medical treatment, drug overdoses, disciplinary hassles, family problems and overt reactions to the ever present tension. As in-house functionaries, the staff make phone calls, facilitate job changes, medical visits, etc. and visit the cell block and the Annex frequently. Tes. Ingham.

Each counselor has between fifteen and twenty clients, the majority of whom come in once a week or once every several weeks. Few are seen on a daily basis. Alone, the caseload would not be burdensome; however, because of the myriad of duties the counselors are expected to fulfill, inmates must often wait several weeks to see them even for an initial screening interview. Counselors must make recommendations to the Work Assignment and Classification Board, establish parole plans, find work release applicants jobs, etc. Added to these regular social work type duties are the extra administrative jobs assigned to the other two counselors. They all feel extremely pressed for time. Tes. Ingham; Stip. 276.

The inmates who testified did not complain about the availability of mental health services. One has weekly therapy sessions, and another has been counseled six or seven times. Two were able to see mental health staff members when they requested to, but one was referred to another program which did not respond to his request for help. Tes. Jacques, Avery, Wallace, Meade.

Access presented one of the most distressing aspects of the program to the experts. Because inmates must apply to, be screened and then accepted by the unit, a motivated inmate who needs help may be rejected in the process. The program relies largely upon self-referrals, which is also inadequate because, as one expert stated, prison teaches the inmates passivity. As a result, many who need help will not seek it. Tes. Ingham, Rundle.

In the face of the professed orientation of the program and the severe understaffing, it is not surprising that plaintiffs' experts found mental health treatment at NHSP basically nonexistent. The program is reactive and crisis oriented, and, while there is some diagnostic work done, there is little or no capacity to follow through with treatment. There are no therapy groups run by the mental health unit. Less than 20% of the inmate population is seen at all, and most of those are counseled only irregularly. Defendants themselves recognize that they do not have the facilities, staff or expertise to deal with seriously disturbed persons. Stips. 80, 456; Tes. Rundle, Brodsky, Payson, Clarke.

According to plaintiffs' experts, the need for professional mental health treatment in a penitentiary is considerable.[5] The prison's psychiatric consultant testified that approximately 40% of the NHSP population needs intensive treatment. He said that only one-half of those are actually ready for

---

5. The experts' testimony was based on knowledge of the general mental health characteristics of the nation's prison population as a whole and not on the characteristics of the plaintiff population. Defendants' past failure to test incoming inmates, combined with the inadequacy of the medical records, makes it impossible for the experts and this court to determine the actual mental health treatment needs of New Hampshire prisoners and whether or not they, in fact, conform to the norms testified to by plaintiffs' experts. Defendants have proffered no reason to believe that the New Hampshire prison population's mental health needs differ from any other American prison population's requirements. Accordingly, I accept plaintiffs' experts' testimony as accurately portraying the need at NHSP.

intensive therapy, while the others need to be professionally monitored with communication lines open and help readily available. According to another expert, between 10% and 35% of any prison population has serious psychotic disorders mandating treatment by major tranquillizers and intensive, continuing relationships with trained professionals. Failure to treat such a disorder would result in progressive deterioration and permanent disablement. He said that another 20% to 25% of prison populations suffer from significant psychotic symptoms which should be treated with minor tranquillizers, "talking" therapy, education and vocational training. Failure to treat these impairments would result in deterioration aggravated by the prison setting. A third expert testified that between 15% and 20% of a prison population has serious psychological impairments mandating intensive psychotherapy, while another 50% suffer from character and behavior disorders which should be treated. They all concluded that the treatment available at NHSP is not adequate to meet the mental health needs they outlined. Tes. Payson, Rundle, Brodsky.

Defendants' expert testified that most individuals suffering from serious psychiatric disorders are weeded out long before they arrive at a long-term prison such as NHSP, and that only 5% of a prison population can be deemed seriously mentally ill. Such a low percentage, he said, makes it a waste of time to utilize professionals to screen and diagnose new inmates. Those seriously ill will be easily identifiable and should be removed to facilities better equipped to handle such problems; he recommended that others in need of counseling could speak with the guards. Tes. Jurczak.

I frankly find it hard to accept the testimony of defendants' expert. Defendants themselves have recognized that there are serious mental health needs at NHSP merely by the fact that they have a mental health unit and a visiting psychiatrist. The guards receive no special training, and no one suggested that they are, in fact, qualified to counsel prisoners. I do not need to make specific findings as to statistics and percentages to conclude that there are significant unmet mental health care needs at NHSP.

## TREATMENT

Treatment refers to all activities having, as a primary purpose, "rehabilitation" or "reformation."

[T]he treatment category of Prison programs distinguishes between services relating to basic health services necessary for physical maintenance of the inmate population and those more specialized services which afford the ability to treat inmate disabilities having a closer [causal] relationship to demonstrated criminal and antisocial behavior. The former services are considered as a part of custody programs while the latter are dealt with under treatment. Ex. 15 at 84.

Defendants assert that positive values can be instilled by inmate involvement in prison industries, food service and plant maintenance; therefore, I will include in this section the work situation at NHSP.

The treatment programs at NHSP cover a broad range. Beyond industrial, kitchen and maintenance work, the prison offers some vocational training. There is a limited formal education program, a library and some miscellaneous classes offered by volunteers. There is a drug rehabilitation program and an Alcoholics Anonymous group. For leisure time activities, the prison offers some recreational opportunities, several hobby crafts and a few inmate run projects. Finally, there is a work release program.

### 1. Work

The prison industries and work crews serve two major functions: to provide the prison with a source of income and labor, and to offer the inmates an opportunity to escape idleness and to acquire some work skills and habits.

The industries License Plate Shop, the Print Shop and the Woodworking Shop. The Plate Shop manufactures motor vehicle license plates for the State. The equipment, fairly typical of any metal press shop,

is old but in good condition. It is not adaptable to other functions. Operation of the machinery requires minimal training, but some instruction is given. It is apparent that the inmates learn little from this work. There was testimony that the Plate Shop has the potential to teach inmates sheet metal skills transferrable to outside jobs, but defendants' consultant found such a concept to be "stretching a point at best." Ex. 13A at III–75. In the past, the Plate Shop was the money-making industry of the prison, but, with the advent of five-year plates, both work and income are unsteady. The fluctuating demand accounts in part for the manifest idleness of the inmates observed by the experts and witnessed by the court on its tour. Tes. Jamieson, Nagel, Laaman, Wallace, Dunn, Jacques; Ex. 13A at III–75: Ex. 13B at III–62–63; Ex. 31 at 22.

The Print Shop provides a variety of printing services for the State, and gives inmates an opportunity to learn a marketable technical skill. The equipment is fairly typical of free world print shops. However, the training is often limited to an hour or less, and inmates frequently learn to operate only a single machine. Although the Print Shop has been fairly busy, the inmates testified that they work about one-half hour a day and drink coffee and play cards the rest of the time. Tes. Jamieson, Nagel, Meade; Ex. 31 at 22.

The last industry, the Wood Shop, manufactures and repairs a variety of wood products, such as picnic tables, benches and picture frames. It is strictly a production operation, and defendants do not purport to teach marketable skills there. It has potential for carpentry training and, in fact, the shop itself serves the dual function of a prison industry and a hobby craft shop. More repair work is done in the workshop than original manufacturing, and most of it is refinishing furniture. Inmates scrape down old pieces of furniture with broken glass, which defendants claim is both a common and acceptable practice. The instructor knows his job and the products are well done, but the inmates are given no orientation or instruction. There is enough work for eight to ten men, but fifteen are assigned there. Mostly they sit around totally idle. Tes. Nagel, Jamieson, Farnsworth, Roy; Ex. 31 at 23.

The maintenance jobs include plumbing, electrical work, carpentry, and the like. The prison usually uses only inmates who already have the skills required for the jobs, and there is no attempt to train inmates in maintenance skills. Tes. Jamieson, Wallace; Ex. 31 at 23.

The food service jobs include food preparation, cooking, baking, butchering, kitchen and dining room clean up. The work hours are "somewhat longer than in other areas," from 5:00 A.M. to 6:30 P.M., and the working conditions are often uncomfortable. Nevertheless, work in the kitchen is popular and sought after. The staff teach the inmates the basic skills. Tes. Jamieson, Jacques.

The laundry equipment is in good operating condition and is adequate to meet the needs of the institution with the exception of the dryer and ironing equipment. Five or six men could do the job adequately, but fifteen are presently assigned there, and the work takes them approximately fifteen minutes to finish. Tes. Jamieson, Avery.

The hall job is the most popular with the inmates. It consists only of janitorial duties, and the inmates are kept busy less than 30% of their working time, and usually only one hour a day. Tes. Jamieson, Laaman.

The outside crew, the farm and trusty janitors are positions which are fully trusty status so that only minimum security inmates are eligible for them. The outside crew does general grounds work; the farmers perform regular agricultural chores, and the janitors do odd jobs in unsecured areas of the prison. They are all popular jobs, and placement at the farm is a step towards work release. There are approximately twenty-five trusty jobs in all. Tes. Jamieson.

There are other miscellaneous jobs such as librarian and hospital orderly which were not described in detail.

Although defendants have written up impressive job descriptions, the fact is that most of the inmates assigned work are idle most of the time. Generally, the jobs take only between fifteen and forty-five minutes a day, and the rest of the time, the inmates are subjected to "an enforced diet of idleness." Tes. Fogel. There is enough work for only a few inmates, but the idleness is also due to a staff insufficient to train, supervise and motivate the prisoners assigned to them.

In one attempt to cope with the general lack of work at the prison, defendants instituted the "Idle Crew." Inmates undesirous of working or for whom there was no work were assigned to the Idle Crew. They were paid one-half the minimum inmate wage and were allowed to attend all functions and programs; they were simply locked up in their cells during working hours. On the average, between forty and fifty inmates, 15% to 20% of the population, were so assigned. The Idle Crew was formally abolished prior to trial. Stips. 309, 310; Ex. 53: SOP # 72; Tes. Clarke.

The Idle Crew was not popular with the inmates. Of the job reassignment requests received by the Work Board, over 50% were from prisoners on Idle Crew requesting a job, usually any job. Of the total of approximately three hundred reassignments or assignment requests received, only twelve indicated a willingness to be transferred to Idle Crew. Assignment to the Idle Crew had a negative effect on some inmates. One inmate started to drink again after months of abstention, and another was told that he had been denied parole because of his lack of good work reports. Ex. 18; Stip. 293; Tes. Laaman, Wallace.

The experts testified about the impact of idleness on a human being in the context of both the Idle Crew and the general loitering on the jobs. Defendants' consultants and the experts almost unanimously condemned the prevalent failure to employ or at least occupy the inmates.

Every person has a need to contribute something of his being to a seemingly beneficial task, regardless of the nature of the work. The more interesting and constructive the work seems to be, the more personal satisfaction the individual derives.

\* \* \* \* \* \*

Without reservation, the Consultants feel that full employment will result in vastly-improved inmate morale, improved institutional operation and the avoidance of disruptive incidents. Ex. 13A at III–108: Ex. 13B at III–93.

With a low conception of self the inmate needs something in which he can take pride. Performing useful maintenance tasks, learning vocational or on-the-job skills, or making a useful product in an industrial setting will make the inmate feel useful. . . . Many inmates have no work skills and are deficient in work habits. If he does not acquire them during his sentence he is worse off when released. Ex. 12 at 9–10.

The experts confirmed the old saying that idleness is the handmaiden of the devil. It allows prisoners to indulge in self-pity for which they have a predilection anyway. Enforced idleness is a "numbing violence against the spirit," and causes good work habits to atrophy. It leads to degeneration because it severely undermines self-confidence, and the natural reactions to lowered self-esteem are either mental illness or antisocial behavior. At NHSP, antisocial, antiauthoritarian and illegal activity are rife; they are at least, in part, one overt reaction to the degredation inherent in enforced idleness. Tes. Nagel, Fogel, Payson, Taber.

According to defendants' expert, idleness, boredom and frustration with work are a daily experience for most people, and it is wrong to foist the middle class work ethic on prisoners. However, he said that individuals desiring to work should be encouraged and that preventing individuals who want to work from doing so would be psychologically harmful to them. Tes. Jurczak.

Slightly less than one-half the population at NHSP is formally unemployed; most of

the rest are effectively idle.[6] Other prisons employ up to 85% of their population with useful jobs. With a prison as small as New Hampshire's, it should not be a real problem to keep the inmates busy at some kind of work. Tes. Nagel.

Plaintiffs' experts testified that "make-work" is only slightly less destructive than pure idleness and that only "useful work" or "meaningful work" can help an inmate acquire the skills and habits necessary for success upon release. They define "meaningful work" as work which teaches skills saleable outside the prison gates and which is both a new psychological experience and a new motor activity. The ratio of staff to inmates would necessarily be higher than in a normal employer-employee setting because of the need not only to train the men, but to motivate and supervise them as well. Tes. Nagel, Payson.

In summary, the reality of the work situation at NHSP is dismal. Each job is bloated with idle inmates who must find distractions at work to occupy themselves. Some inmates lie idle for weeks waiting for jobs. Defendants recognize the explosive dangers of a bored and stagnating population, but are hampered in dealing with the situation by a severe staff shortage and an inadequate budget. While there is no hard evidence that enforced idleness causes psychological damage, the experts and consultants were almost unanimous in concluding that an inmate who remains essentially inactive for the duration of his stay at NHSP will constitute a more serious danger to society after serving his time than he was when he started his sentence. In the words of defendants' consultant, "an opportunity for all to work is essential." Ex. 13A & B at III–63.

### 2. Vocational Training

The need for vocational training is manifest. One-half the population has a less-

than-steady work history; it is estimated that over one-half need vocational training. "This is not to imply that half of the population should be involved in Vocational Training at one time; but the need is at least three times the available resources." Ex. 13A at III–56, III–76, V–15: Ex. 13B at III–54 to III–56, V–8; Tes. Fogel.

The major vocational training program at NHSP is the Auto School which provides instruction in auto mechanics, small engine repair and auto body repair. It is a six month State funded program, limited to twenty-five inmates within eighteen months of their parole eligibility dates. A high school diploma, or its equivalent, is required. The school is adequately and competently staffed and the program is well run. The prisoners were generally enthusiastic about it. The school provides little practical experience, and inmates who complete the course enter the job market at the lowest skill level. However, defendants are presently expanding the complex to include an auto shop where inmates will do both mechanical and body repair work on State vehicles, thereby gaining practical, saleable on-the-job training and skills. Tes. Clarke, Jamieson, Rundle, White, Jacques; Ex. 13A at III–76: Ex. 13B at III–61; Ex. 14 at 14; Ex. 31 at 9.

On-the-job training is provided by the dental prosthesis program, which is under the direction of the prison dentist. It trains one inmate at a time, and there is no set rotation period. The program obviously is an inexpensive method of obtaining skilled services for the inmate population. Ex. 35 at 12; Tes. Fogel.

The New Hampshire Department of Education, Division of Vocational Rehabilitation (Voc Rehab) has a unit at NHSP. It's purpose is to assist emotionally or physically handicapped people in developing career

---

**6.** The situation has recently changed in name with the abolition of the Idle Crew. As of 3/1/77, defendants claimed that a total of 162 jobs (approximately 63% of the population) had been assigned. As of 1/13/76, the total job assignment count was 144 (approximately 55% of the population). As of 3/1/77, 62 in-

mates were not working whereas of 1/13/76, 89 inmates were either unassigned, in quarantine or on the Idle Crew. This leaves approximately 25 inmates at either time unaccounted for. There was no evidence that the underlying work situation had changed between January, 1976, and March, 1977. Tes. Jamieson; Ex. 18.

goals and in placing them in jobs. It operates independently of the prison administration, and NHSP has no control over the program or who it accepts for its services. Approximately one-third of the population is involved in it. Stips. 77, 78, 340; Tes. Taber.

A prisoner's original contact with Voc Rehab is haphazard at best. Inmates are referred to it by a member of the treatment staff or by the inmates themselves. There are specific eligibility criteria and, to determine whether or not an individual meets them, Voc Rehab conducts its own psychological evaluations and medical examinations. While a suitable prisoner is theoretically eligible for a variety of services, the aid actually available inside the prison is generally limited to establishing an employment plan to be implemented upon release. In conjunction with the plan, Voc Rehab may purchase tools for the inmate, help him find employment and counsel him. Stips. 77, 343, 354, 355; Tes. Taber, Meade.

Voc Rehab is a helpful program but one impeded by bureaucratic red tape, misunderstandings and the Parole Board. Prisoners found jobs that were contingent upon having tools, but understood that Voc Rehab offered tools only if the job was secure; the inmates ended up with neither a job nor the tools. Another inmate arranged with Voc Rehab to relocate in Manchester so as to make a clean break from his past, but his plan was nullified when he was paroled on the condition that he return to his home town. Tes. White, Jacques, Wallace. Despite these enumerated failures and impediments, Voc Rehab is doing what it can well in a difficult and demanding setting.

### 3. *Education*

Education programs are needed at NHSP: in approximate figures, 70% of the inmates do not have a high school diploma or its equivalent; 35% have less than a ninth grade education; and only 2% have finished college. The average educational level of the inmates increased from eighth grade in 1969 to grade 10.2 in 1975. In the present population, ten inmates need literacy tutoring; thirty to forty need to be taught basic reading, writing and arithmetic skills; forty are eligible for the high school equivalency program; fifty to sixty inmates could benefit from pre-college, post-GED training; and seventy to seventy-five inmates are educationally able to take college courses. Ex. 13A at V–15: Ex. 13B at V–8; Ex. 35 at 18; Tes. Upton, Jamieson.

The education department is responsive to only 60% of the inmate population; its physical capabilities are even less. Teaching is severely hampered by understaffing. A full-time head teacher runs the program, and two part-time paid instructors work about ten hours a week, eight hours teaching in the classroom and two hours tutoring. There are three classrooms, but, since one of them is available only one-half of the time, there is not enough classroom space to fully utilize even the present volunteer and hired personnel. Ex. 13A at V–15: Ex. 13B at V–8; Ex. 15 at 90, 98; Ex. 35 at 18; Tes. Upton.

Educational instruction is delivered at two levels: adult basic education (ABE) which teaches adults reading, writing and arithmetic, and high school equivalency preparation (GED) which prepares students for the national examination. About twenty students are enrolled in the ABE classes, which is less than half of those who need it. The classes are filled almost to capacity, and inmates have been discouraged from participating in them. The GED classes are also operating at capacity. The classes are divided into fast and slow groups, although the teachers recommend three or four skill levels. There is a tutoring program staffed by volunteers and inmates which, according to the head teacher, is entirely inadequate. Tes. Upton; Ex. 31 at 10; Ex. 15 at 90.

No college level courses currently exist at NHSP, and they are needed and would be well attended. Defendants have arranged for a college program in business administration to be instituted in the near future. At the time of trial, the program had not yet been officially announced, but already thirty-five inmates had signed up for the

courses. The prison will also administer several national tests, such as the Scholastic Aptitude Test, at the inmates' expense. Stip. 326; Ex. 35 at 10; Ex. 15 at 90.

The educational facilities and programs at the prison are augmented by a motley collection of 5,000 books and by "interest courses" such as woodworking, yoga, pottery, art and creative writing. Access to the library is restricted to one visit a week. I note that "while they can request a book loan, they can only take out one book at a time . . . ." *Nadeau, supra,* 423 F.Supp. at 1259. "Interest courses" are provided only when instructors and space are available and when security permits. At the time of trial, creative writing and pottery classes were offered. Ex. 35 at 11; Tes. Upton.

The inmates expressed a desire to further their education but testified that the opportunities offered them generally did not fit their needs. One inmate received his GED at NHSP and "felt great." He said that it was the only thing he accomplished during his time in prison. One was interested when he first arrived there, but, since he had already received his GED, there was nothing for him to do but get involved in a wood carving class. He wants to learn drafting or engineering. Another had had a few years of college and, likewise, was stymied in his efforts to pursue his education until he received a federal grant for correspondence courses taken through a local Junior College. When a teacher from the College visits him to check his work, the visit is counted as one of the regular visits allotted him. Several inmates complained that the education staff was unresponsive to their requests and that their applications went unanswered. Another inmate with only a tenth grade education was never told about the program at all. Tes. Wallace, Laaman, Houman, Meade and Avery.

#### 4. *Drug and Alcohol Programs*

The prison has two programs addressed to alcohol and drug abuse, and about 30% of the population is involved in one or the other. Alcoholics Anonymous meets once a week for a traditional testimonial-style meeting and is open to any inmate who wants to attend or is referred to it. It also runs a 12-Step program for inmates who are seriously committed to ending their dependency upon alcohol. It is run by civilian volunteers. Some inmates said that they derive no benefit from going and that AA is just a "farce." Those who were involved with AA before they were committed to prison found the NHSP program no better, but no worse, than the street programs they had attended. They often went just to get out of their cells. Tes. Clarke, Avery, Jacques, Houman; Ex. 35 at 15.

The Program for Alcohol and Drug Abuse (PADA), a division of the New Hampshire Department of Health and Safety, offers individual and group counseling. While part of the treatment program, PADA has its own evaluation methods and operates independently of prison authorities. One inmate who knew of the program thought well of it, but another had never heard of it and a third said that he had written PADA requesting their services almost three weeks before the trial, but had not received any response. The mental health and classification files reveal that the inmate who had never heard of PADA was the one most in need of their services. Ex. 31 at 15; Ex. 35 at 16; Ex. 51; Stips. 452–456; Tes. Clarke, Jacques, Avery, Meade.

#### 5. *Leisure Time Activities*

The major leisure time activity at the prison is "hobby craft," of which there are two basic types: (1) crafts that can be done in the cell, such as leather craft, glass painting, wood carving, etc.; and (2) the woodworking program carried on in the Wood Shop. In order to participate in either program, an inmate must be in the general population, have "meritorious conduct and work records" and be approved by the Director of Treatment or by the Foreman of the Wood Shop. The inmates provide their own equipment and supplies and may sell their products to visitors. Ex. 31 at 13; Ex. 35 at 15; Ex. 53: SOP # 22.

Other recreational activities include softball and basketball as the seasons permit, horseshoe pitching, pool and table tennis. Lifting weights is very popular, and movies are shown periodically.

Recreation facilities and activities are limited. The indoor gym is very small, and the outside yard is not large enough for either hardball or football. The two recreation rooms are dismally uninviting. There is little for the inmates to do so that, during yard time, they generally play cards, shoot pool and just hang out. There are no events unless the inmates organize them themselves. One long-term inmate has, on his own initiative, become the sports leader of the prison. This situation contrasts sharply with the experience of inmates under prior regimes when games were organized and leisure time filled with activity. Tes. Clarke, Fogel, Nagel, Houman, Dunn.

Adequate recreation is important not only to the inmates for relief of the monotony of prison life, but it also makes the administration of the prison easier. It acts as a safety valve, allowing release of the pent-up energies of a closely confined, young and active population. Without strenuous activity, hostility is inevitable. Defendants' consultants and plaintiffs' experts urge that "constructive, well planned, and organized recreational programs" be made available to the inmates. Ex. 35 at 18; Ex. 13A & B at III–57 to III–60; Tes. Nagel, Fogel.

An active and officially sanctioned inmate self-help group is the Granite Quarry Jaycees. It is affiliated with the statewide Jaycees. They have established an art and tutoring program, and, because of the lack of a good orientation program for newly committed prisoners, and, after some struggles with the administration, they established their own inmate orientation program. Tes. Dunn.

### 6. The Pre-Release Program

Plaintiffs claim that defendants fail to provide an adequate decompression and adjustment period for those about to be released. In plaintiffs' expert's words, the transition "from an absolute, artificial steel and mortar womb with very few choices and opportunities for decision making to the street" leaves the inmate completely unable to adjust. This description of the transition is no exaggeration; one inmate was released from the prison directly to the street immediately following several months of punitive segregation. Tes. Nagel, Houman.

The single pre-release program at NHSP is the work-study release program authorized by NH RSA 651:25. Participating inmates live at a half-way house in Concord, New Hampshire. While the house has a capacity of eighteen, only eleven inmates were living there as of January 13, 1976. The home is adequately staffed and well run, and little criticism was leveled at the program itself. So far, very few of those who go to the half-way house return to NHSP. Tes. Jamieson; Stips. 362, 365, 367; Ex. 13A at III–96: Ex. 13B at III–82.

Attaining work release is a lengthy process. The screening of applicants is done by the Work-Study Release Board upon recommendation of the Work-Release Supervisor. If the Board approves an applicant, the recommendation is sent to the Warden, who, if he approves it, sends it to the sentencing judge. If the sentencing judge agrees, the inmate must then develop an employment plan for approval by the Supervisor and the Warden. Once the inmate and his plan are accepted, he then waits for space at the half-way house. The Board of Trustees of the prison has an ultimate veto power over an inmate's pre-release, and an application for work release may not only be denied, but can be tabled at any stage of the proceeding. Ex. 53: SOP # 53; Tes. Clarke, Wallace.

The criteria for eligibility are written and given to the inmates, but sometimes are changed with little notice. Stips. 442, 444–449. It is also clear that factors other than those outlined in the notice to the inmates are considered at all levels of the screening process. Inmates with violent backgrounds, who most need gradual integration into the community, are the least likely candidates.

The inmates complained of arbitrary and bureaucratic responses by the Work-Release Board. One was rejected because his sentence wasn't long enough and was denied a furlough to seek a job because he wasn't on work release. Another was turned down because of what he deemed to be a minor disciplinary infraction, even though he had already been accepted to a rehabilitation center for alcoholics. His testimony was bitter; "they don't just close the door in your face; they kick you when you're down." Tes. Nardi, White, Jacques.

Prisoners in minimum custody are eligible for work on "The Farm" as trusties. Since these inmates leave the confines of the prison each day and work in pleasant surroundings with a minimum of supervision, the job is highly desirable and difficult to get. There does not seem to be any written standards for trusty status, nor have the inmates been advised how to achieve it. Tes. Wallace.

## 7. *Religious Programs*

While religious programs and visitation are not traditionally deemed "treatment," the responsibility for them at NHSP rests upon the Director of Treatment; therefore, they will be dealt with in this section.

The religious programs are minimal and removed from the day-to-day activities of the inmates. Both a Catholic and Protestant chaplain work part-time at the prison offering Sunday services and individual counseling. They try to circulate through the institution seeing inmates. A nondenominational Bible Study class meets twice a week. There is no separate facility devoted to religious services; the chaplains are forced to share space with the mental health division, and the gym doubles as a chapel. "There is no privacy for individual counseling, and it is impossible for the average prisoner to drop in for a moment of prayer or meditation or for individual counseling without making advance arrangements." Ex. 13A & B at III–51. The lack of adequate facilities detracts from the religious purpose of the programs that exist, and it is impossible at NHSP to offer "the

richness and diversity essential to an effective religious program." Ex. 13A & B at III–53; Ex. 31 at 11, 12; Ex. 35 at 14; Tes. Clarke, Fogel.

## 8. *Visitation*

The visiting room is sparse and uninviting. Visitors sit on one side of the large tables and inmates on the other so that conversations are easily overheard. The furniture arrangement also hampers any physical demonstration of warmth or affection and deprives the inmates of any semblance of privacy. One inmate and his wife testified that she visits him regularly twice a week, but that they never talk about anything personal because of the lack of privacy. Each inmate is normally entitled to two visits a week; visits of two hours' length are permitted on week days and of one hour's length on week-ends and evenings. An inmate's friends and relatives may visit so long as they are included on the inmate's visiting list. Children under sixteen must be accompanied by an adult. Ex. 53: SOP # 49; Ex. 31 at 8; Ex. 35 at 14; Stips. 125, 126, 487; Tes. Robert and Della White.

The most hotly contested issue concerning visitation is defendants' policy of withdrawing or restricting visitation privileges for disciplinary purposes. At present:

Inmates in segregation and inmates in solitary confinement will not be permitted visits unless specifically authorized by the Warden. Inmates otherwise segregated may be denied a visit if, in the opinion of the Warden or his designated representative, it would jeopardize the security of the institution. Visiting privileges may be otherwise reduced or taken away from an inmate because of a violation of an Institution rule and regulation.

\* \* \* \* \* \*

The visiting privileges of an inmate may be suspended or revoked by the Warden because of the inmate's poor conduct or for other good reason. The inmate so affected will be notified when he may again have visits. Ex. 53: SOP # 49, 2/19/75, at 2, 5.

In general, visits are not prohibited a prisoner in any status except when he is in isolation in the West Wing or when a Disciplinary Board explicitly restricts them. The Disciplinary Board does not use its authority to withdraw or limit visitation indiscriminately. Between August 19, 1975, and April 28, 1976, only two inmates had their visitation privileges restricted, and none had them withdrawn completely. In both cases, defendants specifically permitted visitation with the inmate's immediate family and in one, the inmate's girlfriend was also allowed to visit. However, there was evidence that, on occasions, visits have been denied inmates and visitors without reason or explanation. Ex. 22; Stip. 483; Tes. Laaman, White, Houman.

While the experts debated the parameters of the need that visitation satisfies, they all agreed that the total denial of visits could aggravate any psychological disorder. Plaintiffs' experts testified that a liberal visitation policy can mitigate the detrimental psychological impact imprisonment has on an inmate and his family. The more contact with the outside world he has, the less he will turn to and rely upon his forced affiliation with the convict culture and values. The time allowed visitation at NHSP is too minimal, they said, to allow for the development and maintenance of real bonds with the outside. The arbitrary denials, the physical barriers and the lack of privacy aggravate the situation. Plaintiffs' experts testified further that visitation is so fundamental to an inmate's equilibrium that it should never be totally denied except in situations of real danger. Defendants' expert found the present visitation policy generous. He also said that, while no one has proven visitation either helpful or harmful, it is humane and should be encouraged. Tes. Rundle, Brodsky, Jurczak.

It should be noted that there is no separate room for attorney interviews which now take place in the regular visiting room or in the extra visitation room adjacent to it. Stip. 496.

## MAIL

The mail regulations at NHSP concern two types of mail, privileged and nonprivileged. Privileged mail is correspondence to and from designated state and federal public officeholders, courts and attorneys of record. All privileged mail, either incoming or outgoing, is logged. Correspondence with officeholders and the courts is completely confidential, but the prison reserves the authority to open, in the presence of the inmate, and for inspection only, incoming attorney-client mail. The prison also requires an attorney to "first identify himself and his client to prison officials before his correspondence becomes privileged." Ex. 53: SOP # 81 at 2.

All other mail is nonprivileged and may be inspected at any time for contraband, money orders or checks, and may be read to ascertain if it includes any of the following types of material or information pertaining to:

Escapes, incitement to riot, threats, extortion, blackmail and the introduction of contraband into or out of the institution. Any discussion or planning of other criminal activity or activities in violation of prison rules and regulations.
Letters in code or unintelligible, obvious attempts to circumvent mail regulations.
Pornography.
Solicitation of gifts of goods or money from persons other than family members.
Correspondence constituting or contributing to the conduct or operation of a business.
Correspondence which would, if transmitted, create a clear and present danger of violence and physical harm to persons or property, or severe psychiatric or emotional disturbance to the inmate. Ex. 53: SOP # 81 at 2.

Money orders and checks are deposited in the inmates' accounts. Anything the mail clerk believes is pornographic is sent to the Literature Publication Screening Committee, and contraband is sent to the Major or the Warden. The author of a letter is notified upon its rejection. The prison reserves the right to keep rejected outgoing mail in the inmate-author's file. Prisoners'

mail has been copied and the copies have been placed in the inmates' files. Stip. 463, 465, 466, 476, 478; Ex. 53: SOP # 81 at 3.

## CLASSIFICATION

Although the effort is largely embryonic and uncoordinated, "the rudiments of a classification system [are] in evidence" at NHSP. Ex. 12 at 9. The present system, instituted in November, 1976, combines the two functions of work assignments and classification of inmates, previously done by separate boards. Tes. Clarke; Ex. 12 at 9; Ex. 35 at 5.

The Work Classification Team usually meets weekly and interviews and evaluates up to ten new inmates each of whom must be assigned a custody classification, a treatment designation and a job. The Team also considers between fifteen and twenty requests for job changes, and, recently, its policy has been to conduct interviews with inmates requesting job reassignments. The assignment of work is the Team's main function. Each member carries a full-time job at the prison in addition to serving on the Team. Tes. Jamieson, Clarke.

The classification process begins with the interviews and tests that are administered to new inmates in quarantine. The Team is supposed to have before it the complete file on each inmate it considers. Before the man is interviewed, it has "an excellent picture" of him, including the results of the psychological tests administered to him in quarantine, his criminal background, the state of his physical, mental and dental health, his education, work skills and habits, marital and family status, etc. The interview is supposed to take between ten and thirty minutes, depending upon the inmate and his needs. Tes. Jamieson, Clarke; Ex. 53: SOP # 102; see Stip. 265.

The Team must assign to each inmate a security and a treatment classification. Maximum security requires "close custodial supervision," medium requires "less stringent supervision to the extent that the person may function in settings requiring periodic observation within the institution," and minimum requires "minimum custodial su-

pervision." The new inmate is also assigned a treatment designation of limited, moderate or intensive, so as to provide some indication to the treatment staff of which inmates are most likely to benefit from their attention. Tes. Jamieson, Clarke; Ex. 53, Draft SOP on Security Classification Rating, 1/6/77; Ex. 53, Draft SOP on Treatment Assignments and Reassignments, 1/6/77.

Plaintiffs' experts and defendants' consultants condemned three major aspects of defendants' classification system: first, that, in fact, there is hardly any system at all; second, that, as written and proposed, it is inadequate; and, third, that, without separate housing, work and treatment programs, no classification could have any impact upon the lives of the inmates. Tes. Fogel, Brodsky, Payson, Rundle, Nagel; Ex. 12; Ex. 13A & B at III–21 to III–32; Ex. 14.

The system in practice does not follow the procedures as outlined: little data is actually used by the Team; criminal records are frequently not complete; and interviews are often cursory. The information contained in the inmates' files varies greatly with each one, but few, if any, contained even a majority of the materials that are supposed to be considered. In two of them, there were no records at all of any classification or treatment assignments, and in several others the records were limited to only those designations. The treatment assignments and security classifications are confused by prison personnel, and those that are given a man remain in his file; neither the men nor the relevant prison personnel know them. Tes. Dunn, Farnsworth, Meade, Roy, Ingham; Ex. 12 at 9; Ex. 4; Ex. 40.

The inmate experience in the classification process, like so many other aspects of prison life, did not correspond at all with the outline of the procedures given by defendants. One inmate's interview lasted five minutes during which he was asked about his educational background and his job preference. He was asked no questions concerning his vocational interests or his

treatment needs. He was given a limited treatment assignment because his "rehabilitation goals" were "undetermined," even though he had been sentenced to NHSP with specific instructions by the sentencing judge that he was to receive psychiatric and drug and alcohol abuse treatment. He was classified "maximum security" and assigned to the Print Shop, which was not his job preference. The majority of prisoners are initially classified for maximum security and remain so designated. Ex. 2; Ex. 4; Ex. 40; Tes. Meade, Farnsworth, Dunn, Roy.

Plaintiffs' expert testified that the procedures as written and outlined above are insufficient to satisfy the limited purpose of identifying the needs, interests and abilities of each inmate. The classification system does not operate on an actuarial basis, does not have any built-in accountability or any procedures designed to ensure the system's reliability, and does not provide for written implementation plans, review or any follow-up. Tes. Brodsky.

Finally, the classification system does no more than "hang a tag" on an inmate. The treatment assignment has no effect whatsoever upon eligibility for jobs, programs or housing inside the prison, and, because it is not communicated to treatment personnel, it makes treatment neither more nor less available to any individual inmate. Likewise, the security classification does not affect an inmate's housing or the availability of programs to him; its sole effect is that minimum custody inmates can work anywhere, including outside the prison walls, while maximum and medium security inmates must work in secured areas. The classification label pasted on an inmate is purely semantic. Tes. Ingham, Jamieson.

Both parties recognize that a major impediment to a workable classification system is that only the Main Cell Block and the Annex are available as housing units, thereby making separate housing for different groups of inmates functionally impossible. Plaintiffs' expert suggested dividing the Main Cell Block into units so that different categories of inmates could be separately housed. Tes. Nagel.

This aesopian classification system, according to plaintiffs' expert, leaves the inmates uncertain as to what is happening. They are led to believe that the Work Classification Team makes portentous decisions concerning their lives, but, with little follow-up and no feed-back information, the inmates begin to feel that they are only victims of the system. Tes. Brodsky. Defendants' expert, on the other hand, testified that a sophisticated classification system is not necessary to adequately manage the prison, and he was favorably impressed with the personal approach of the Work Classification Team. Tes. Jurczak.

There are two real systems of classification in effect at NHSP. The first is the self-imposed protective custody classification. Inmates in need of special protection from the predations of members of the general population are housed separately and kept apart from the rest of the prison in all their activities. While all prisons have such a protective custody population, the unit at NHSP is at least three times greater than the average in other institutions. The reasons for this are multifarious, but it is indicative of uncontrolled violence at the prison. Tes. Fogel. *See Nadeau, supra,* 423 F.Supp. 1250.

The second operative system of classification is the allocation of work. However, job assignments are generally based on the prison's, not the prisoners', needs. Because the prison's maintenance needs must be satisfied and its industrial obligations met with inmate labor, work assignments are generally made on the basis of availability and sometimes vocational skill. Inmates are not often asked what their preferences are, and, if they are expressed, their desires are seldom fulfilled. An informal seniority system keeps the choice jobs occupied by long-term prisoners. In terms of either security or treatment, this system is basically random and useless. Tes. Fogel, Jamieson.

## MANAGEMENT AND ADMINISTRATION

Plaintiffs contend that, while lack of money and poorly designed facilities are, in

part, responsible for the conditions of which they complain, the largest contributing factors are mismanagement and maladministration. These conditions, they say, underlie and compound all other deficiencies at NHSP. There is no doubt that, for sometime prior to trial, authority was fragmented, lines of communication had broken down, and the prison lacked any semblance of effective organization. Ex. 14 at 21; Ex. 12 at 1–2, 5; Ex. 13A at III–104; Ex. 13B at III–89; Tes. Fogel, Nagel, Dunn. However, the evidence was, and my findings are, specifically limited to the period of litigation of this case. There is no criticism implied here of the new administration at NHSP.

Defendants' consultants found that many of the conditions about which plaintiffs complain stemmed from mismanagement. The sanitation problems at the prison were a result of a lack of managerial direction and leadership. The large backlog of unheard major disciplinary cases was "a severe indictment of management." The staff refused to take any responsibility, and "lower level decisions were being bucked direct to the Warden's office." The pervasive "it's not my job" attitude was nourished by the lack of communication between 'brass' and the 'line staff.' Communication by the authorities to the lower echelons was by memoranda, or sometimes through inmates, rather than by face-to-face communication. There were very few staff meetings. The total situation resulted in a staff "frustrated by inadequate training, confused policies and inadequate supervision." Ex. 12 at 1, 3, 4–5, 11; Ex. 13A at III–104: 13B at III–89.

As of August, 1976, there were no job descriptions or post orders. Post orders serve to standardize procedures and train inexperienced or inept employees. They serve as the basis for performance checks by supervisors . . . . .

In addition, written post orders are necessary to provide continuity in the handling of inmates. Ex. 12 at 7.

Such orders should describe general routine procedures, special duties and the schedule of prescribed activities so that responsibilities are clearly defined. Defendants' consultants found it "mandatory that post orders for each custodial post be prepared, kept current and distributed," Ex. 14 at 8, and this court concludes that defendants' failure to have adequate post orders contributed to the overall confusion as to duties and responsibilities found by plaintiffs' experts and defendants' consultants. The prison is presently in the process of developing post orders. Stip. 462; Ex. 14 at 8; Ex. 13A & B at III–9; Ex. 12 at 7; Tes. Ash.

The prison staff was not adequately trained. As of January, 1976, "training at all levels [was] inadequate and greatly needed," Ex. 14 at 25, and on-going staff training was recommended by the Director of Treatment. What classes existed were frequently interrupted or delayed due to operational needs and staff shortages. In April, 1976, defendants instituted a training program which requires that new employees attend one hundred ten hours of classes within their first year at NHSP at the rate of approximately two hours per week; I note that, if anything, the staff shortages have worsened since early 1976. There is no pre-service training *per se*, but there is an in-service orientation/indoctrination program designed to introduce new employees to the prison. After the first year, all employees are required to take between twenty and thirty-six hours of training. Forty-two courses are offered covering a wide variety of topics but focusing mainly on security and control of the inmates. Plaintiffs' expert found the training to be sporadic and fragmented. Ex. 35 at 19; Ex. 13A & B at III–11; Ex. 14 at 9; Ex. 44; Tes. Dewey, Fogel.

Lack of training can lead to unprofessional conduct, and there was evidence that, at times, the employees at NHSP allow their own feelings and reactions to govern and motivate their actions rather than professional considerations. Some inmates complained that some guards are insensitive, calloused and brutal, but the majority of witnesses, including plaintiffs' experts and

some prisoners, testified that the correctional officers on the whole are concerned, sensitive and conscientious. While "unprofessional conduct" may have occurred at NHSP, the court concludes from all the evidence that it was not consistent or widespread and that no single incident was so serious as to merit separate constitutional consideration. And, it is important to note that there was much evidence that the prison has "a nucleus of fine staff with many dedicated and capable employees." Ex. 12 at 3. Tes. Payson, Upton, Ingham, Nagel, Williams, Ash, Piela, Daggett, Tweedle, Batchelder, Houman, Dunn, Vayens, Laaman, Boston, Jacques, Avery; Ex. 13A at III–105: Ex. 13B at III–90; Ex. 12 at 74; Ex. 40.

There was some evidence that rules are selectively enforced in an arbitrary manner, and plaintiffs' experts, defendants' consultants and a perusal of the prisoners' files support this contention. In the past, inadequate training plus the lack of complete written rules and regulations and constant changes in policy resulted in inconsistent application of the rules. Inmates testified consistently that they were "written up" and punished for doing things that others were doing or had done without consequence. Some disciplinary reports were screened out and not acted upon, but such reports remain in a prisoner's file for future action or consideration by the Parole Board. Selective enforcement of the rules increases the prisoners' hostility and anger and can lead to a dangerous situation. Ex. 12 at 7; Ex. 15 at 74; Ex. 40; Tes. Rundle, Houman, Laaman, Dunn.

Another aspect of the general mismanagement of the prison was the minimal understanding and knowledge of the overall facets of prison life by some of the senior personnel. For example, a Major at NHSP who had been employed there for sixteen years was almost completely unfamiliar with the mental health unit and the education department, knowing little of what they do or offer. Nor was he familiar with the programs against drug and alcohol abuse. He has served on the Work and Classification Board and is in charge of security. All of these programs rely upon referrals from the guards and especially the classification boards. Stips. 434–438.

Defendants' consultant found repeatedly that the programs offered the inmates are fragmented, isolated and out-of-touch with the inmates' daily lives. Part of the problem was the lack of leadership in the implementation of the plans. Defendants demonstrated to this court an inordinate concern with labeling and paper work and little interest in follow-up and implementation. For instance, the Director of Treatment decried the lack of treatment staff, but had shown no initiative in fostering group counseling. PADA is part of his department, but he did not receive any reports from the program nor did he know whether or not it was successful. And, as Supervisor of the Medical Department, he was unaware that the doctor supplements the medication budget with his own money. Tes. Clarke; Stips. 452–59. The physical plant also contributes to the fragmentation of the programs. The offices of the supervisors and different programs were located in a separate part of the prison from their functional offices, frequently in areas of the prison which discourage easy contact between the staff and the inmates. See, e. g., Ex. 13A & B at III–53.

A lack of understanding and coordination pervaded the prisoner grievance process. In January, 1976, the Warden instituted the Inmate Communication Committee (ICC) in order to "achieve better understanding and rapport" between the inmates and the staff. ICC has four inmate representatives elected from the general population and four members of the administration. Its purpose is to "deal with the larger issues that affect the institution" and not to consider individual grievances or complaints, which should be handled by the "line staff" with review by the Grievance Review Committee. However, staff members considered the ICC as a grievance board and were not aware that individual problems may not be considered by it. Ex. 36: SOP # # 75, 76; Tes. Clarke.

It is through the ICC that the administration and the inmates parley. New rules and procedures are announced to the population through the ICC, and common inmate grievances, such as troubles getting medical attention, are hopefully resolved there. In one inmate's words, the ICC has "done well in the past few weeks." The communication is going both ways, and the ICC benefits both groups. Tes. Dunn; Stip. 443.

Perhaps the most serious indictment of the management of the prison is the fact that, over the past several years, defendants have hired four major consultants to study the prison and to make recommendations as to how to correct its long-term and short-term deficiencies. All of the consultants made similar recommendations concerning sanitation, staff training, written rules and regulations, post orders, classification, etc. The sanitation situation, for instance, was pervasive, persistent and, from the court's point of view, totally unnecessary. The experience of the final consultant highlights some of the managerial causes of defendants' failure to clean up the prison.

On Tuesday, October 12, 1976 this consultant conveyed his deep concern about the unsanitary conditions prevalent throughout the institution and suggested the inauguration of an immediate clean up campaign. The Warden called a meeting that same day and very emphatically ordered his department heads to have the institution cleaned with debris removed and properly disposed of. Two weeks later, on October 25th, a tour of the institution was made to check for improvements. They were so few that they were hardly noticeable. This fact was conveyed to the Warden who in turn made a limited tour in company with supervisors who should have been responsible for carrying out the program. They excused their noncompliance by claiming they had never received clear orders regarding any change in sanitation standards.
This incident was positive proof that orders were not being delivered and/or were not being carried out. It also demonstrated management faults in that no written directive was issued to back up the verbal order and no compliance check was made until suggested by this consultant. This demonstrated a clear cut breakdown in communications and evidence[d] that a substandard level of performance has been tolerated. Inaction had become the standard. Ex. 12 at 4–5.

## HARASSMENT

Plaintiffs claim that defendants have engaged in a pattern of deliberate discriminatory enforcement of the rules and harassment against them in retribution for this law suit and the exercise of their political beliefs. Mindful of the fact that plaintiffs' attorneys have not had full access to the classification and mental health files submitted as exhibits in this case, I have carefully combed them for indications that plaintiffs have suffered for the exercise of their constitutional rights.

The records reveal that of the twelve named plaintiffs only one worked throughout the period of this litigation, three remained "unassigned" and locked in the Annex, and the other eight were assigned to and spent varying periods of time, from several months to well over a year, on Idle Crew. Of the eight originally designated as idle, five were assigned to the Idle Crew by a disciplinary board after the so-called walk-off by the North Yard Crew. One of those, although a member of the North Yard Crew, had not participated in the walk-off, and two had been found "not guilty." Defendants' regulation establishing Idle Crew stated that "[d]etermination as to Idle status will be made by the Work Assignment Board," and "stressed that [such determination] is not taken for punitive reasons." Ex. 40; Ex. 53: SOP # 72.

Many of the plaintiffs placed on Idle Crew had excellent work records and few or no disciplinary reports. Several had leadership roles in the prison, mostly as elected members of the prisoners' grievance committee. Defendants' regulation stated:

Criteria for assignment to the Idle Crew will be based on the inmates reported attitude, behavior, work reports, disciplinary reports and overall institutional adjustment. Ex. 53: SOP # 72.

The placement of several of the plaintiffs on Idle Crew closely followed their motions to intervene in this case. One inmate, not involved in the North Yard Crew incident, was assigned to the Idle Crew within a week of his intervention in this case, and another within two weeks, both despite good work reports and few or no disciplinary reports. The assignment of several plaintiffs to the North Yard Crew itself followed their filing of this suit, and the inmates see the placement as a form of harassment. However, because this suit originally arose out of the lockup that produced both the Idle Crew and the North Yard Crew, this court is reluctant to draw an inference solely from the coincidence in timing.

Plaintiff Laaman detailed for the court the incidents he believes demonstrate the harassment he claims. For the fifteen months prior to the lock-up, he had a clean record with no disciplinary reports. The lock-up was instituted and he filed suit in late August, 1975. On October 2, he received a disciplinary report for failure to button his shirt. It was dismissed. On October 17, he participated in the North Yard Crew walk-off and was found not guilty and was assigned to the Idle Crew. On October 20, he was not allowed to see two visitors from a media group in Boston. They had been allowed to visit before. On October 22, he was written up for taking a small amount of sugar out of the dining hall, and on October 23, he got a disciplinary report for taking a pint of milk. He had been allowed to take sugar and milk before. He received ten days punitive segregation for the sugar violation. The disciplinary board originally dismissed the disciplinary report about the milk, but the Warden reinstated it, and he was found guilty. He was given five days segregation. On November 5, he was again denied a visit with the Boston media visitors despite the fact he had complied with all the

Warden's directives concerning the visit. On December 7, he was written up for returning to the cell block too early and received ten days segregation. He claims that, in December, he was written up for arguing with a correctional officer after the guard had insulted his visitor, but there is no record of it. He was placed in segregation after the Christmas Day Riot at the prison and was charged with participating in it. He was ultimately found not guilty of the disciplinary report, but guilty in a court of law. While in segregation, he had to wait twelve days for a shower and was given a total of three in thirty-nine days of segregation. He was allotted a total of four one-half hour periods of exercise in the thirty-nine days, but three of them were ended early. Once he insisted upon his full half-hour and received a major disciplinary report for refusing to obey an officer. The charge was reduced to a minor one, but he was found guilty and given fifteen days punitive segregation in the Annex. It was the first time a prisoner had been given time in the Annex for a minor report. He was denied visits during his time in the Annex. When he wrote to the Warden about his visits, referring to a written policy which allowed visits unless they were specifically withdrawn by the Disciplinary Board, the rule was changed by the Warden. He was released from the Annex in March and placed on Idle Crew. He immediately requested work in the hall, which was denied. He was told that there was no need, but other inmates were subsequently assigned there. He was later offered a job in the Plate Shop, which he refused. He was assigned to the hall on December 6, 1976, after the announcement that Idle Crew was going to be phased out, but he was not notified and learned of his new duties only when a guard told him to report to work. He received one minor disciplinary report between late January, 1976, and early December, 1976, and has had no trouble with his visits since late January. Tes. Laaman; Ex. 40. I conclude that these incidents are so numerous and so petty and, in many instances, so ill-founded

that they spell out a pattern of harassment against the named plaintiff Laaman.

The records as a whole, while confusing and incomplete, lend little support to plaintiffs' contention of systematic discrimination against the other named plaintiffs. The incidence of disciplinary reports increased in some instances around the time this suit was filed, but, except in the case of Laaman, this court discerns no consistent pattern sufficient for a finding of harassment. However, one recorded incident disturbs the court. At the only Administrative Segregation Board meeting found by this court in the records, the status of seven inmates was reviewed. The Board recommended that three not be removed from segregation; of the three, two were named plaintiffs and the third was a jailhouse lawyer well known to this court. None of the other inmates reviewed were directly or indirectly involved in this litigation. Tes. Laaman, Dunn; Ex. 18; Ex. 40; Ex. 51.

Plaintiffs have not shown that the denial of visitation privileges has been used by defendants as retribution for this lawsuit or plaintiffs' political activities. While isolated incidents of arbitrary denial have been shown, there is, again, no consistent pattern sufficient for a finding of harassment. Ex. 40; Ex. 51; Tes. Laaman.

## CELL SEARCHES

Plaintiffs allege that the August, 1975, shakedown of the prison was conducted in a wanton manner. Plaintiff Laaman testified that seven or eight guards, armed with mace, sticks and helmets removed him from his cell, put him in another one, and strip searched him. While he was in the other cell, he heard sounds of glass and wood breaking. Three hours later, he was put back into his own cell and found that it had been, in effect, ransacked. His personal effects, his books, and legal papers included, were piled up, Tang had been spilled everywhere and a filthy mattress had been thrown on top of everything. He asked for his own mattress, but was told that there was nothing to do about it and was locked in. One other inmate testified that his television was smashed, his bed board broken and his toilet paper dumped into the toilet bowl. Tes. Laaman, Houman.

A Captain at NHSP testified that he had been in charge of a team of men for the cell shakedown and that he had been given instructions to remove the men from their cells, to confiscate civilian clothing, excessive shelving and other materials, and all contraband. They were further told to avoid breakage and to replace all items not taken where they had originally been. According to his testimony, the search process was orderly. Inmates were asked to step out of their cells, were strip searched and given back all noncontraband items. No force was used. Mattresses with inspected with a metal detector and, if something was found, the mattress was removed and another was given to the inmate. All property taken was logged and placed in a plastic bag. The search team which he headed consisted of three to four men, none of whose names he could remember, and no one wore a helmet or bore arms. He testified that he encountered no problem in conducting the search of plaintiff Laaman's cell. The cell was neat, but full. He could not recall why plaintiff Laaman's mattress had been confiscated, but testified that a contraband multiband radio was taken. Tes. Waite. I note that defendants did not produce the records of the property confiscated.

## THE LAW

The New Hampshire prison is not marked by barbaric and shocking physical conditions, and there is no flagrantly abusive conduct by the guards or administration. The prison is not overcrowded and, although the cells do not meet minimum space requirements, each man has one to himself. The food is nutritionally adequate, and, with the construction of the new shower facilities, the personal hygiene needs of the prisoners can be met. The inmates are permitted outdoors for exercise. Medical services are available to some extent. In sum, New Hampshire felons are adequately warehoused.

But, "[t]here is no iron curtain drawn between the Constitution and the prisoners of this country," *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), and the Constitution demands more than cold storage of human beings who have transgressed the criminal laws. Constitutional limitations on prison operation include: the Cruel and Unusual Punishment prohibition of the Eighth Amendment, *Gamble, supra*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, *Wolff, supra*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935; *Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). It is by these standards that I must judge the conditions of incarceration at NHSP.

Federal courts should be wary of intruding upon the domain of the state in administering its prisons and in monitoring the conduct of the prison officials. Prison administrators must be allowed great latitude in meeting their Herculean task of "maintaining internal order and discipline, . . securing their institutions against unauthorized access or escape, and . . . rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody." *Martinez, supra*, 416 U.S. at 404, 94 S.Ct. at 1807. Prison is, by definition, "a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so, . . . [and who] may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life." *Wolff, supra*, 418 U.S. at 561–62, 94 S.Ct. at 2977. Prison administrators must have broad discretion in determining how to fulfill their labyrinthine task.

Nevertheless, federal courts must be equally mindful of and vigilant over the rights retained by convicted persons throughout their incarceration.

Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948). But, though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. *Wolff, supra*, 418 U.S. at 555–56, 94 S.Ct. at 2974.

Accordingly, the "deference which shields officials engaging in intemperate action and which excuses judicial myopia is incompatible with our role as arbiters of the Constitution . . ." and "should be tendered only as to these necessary or essential concomitants of incarceration." *Newman v. State of Alabama*, 503 F.2d 1320, 1329 (5th Cir. 1974), *cert. den.*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975). *Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977).

■ This court believes that the Eighth Amendment is not limited to tempering only the infliction of cruel and unusual punishment on the physical body; its protections extend to the whole person as a human being.

At bottom, then, the Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments. The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings. A punishment is "cruel and unusual," therefore, if it does not comport with human dignity. *Furman v. Georgia*, 408 U.S. 238, 270, [92 S.Ct. 2726, 2742, 33 L.Ed.2d 346] (1972) (Brennan, J., concurring.).

A penalty also must accord with "the dignity of man," which is the basic concept underlying the Eighth Amendment. This means, at least, that the punishment not be "excessive." . . . First, the punishment must not involve the unnecessary and wanton infliction of pain.

Second, the punishment must not be grossly out of proportion to the severity of the crime. (Cites omitted.) *Gregg v. Georgia*, 428 U.S. 153, 173, [96 S.Ct. 2909, 2925, 49 L.Ed.2d 859] (1976) (Opinion of Stewart, Powell & Stevens, JJ.).

*See, e. g., Furman, supra*, 408 U.S. at 330, 92 S.Ct. 2726 (Marshall, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968).

The *Gregg* plurality looked first to contemporary standards and legislative sanction to determine the general acceptability of a punishment. If a punishment is selected by a legislature, the court must presume its validity, and a plaintiff has a heavy burden to upset the legislative choice. "We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Gregg, supra*, 428 U.S. at 175, 96 S.Ct. at 2926. Incarceration has been chosen by the Legislature of New Hampshire as the punishment for most crimes, a choice neither plaintiffs nor the court questions.

However, the Supreme Court outlined a second test that must be met for a punishment to pass constitutional muster.

The Court also must ask whether [a punishment] comports with the basic concept of human dignity at the core of the Amendment. . . . [T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering. (Cites omitted.) *Id.* at 182–83, 96 S.Ct. at 2929.

At least five members of the Court have accepted this test in the context of the death penalty, see *Furman, supra*, 408 U.S. at 270–79, 92 S.Ct. 2726 (Brennan, J., concurring), and 408 U.S. at 330–42, 92 S.Ct. 2726 (Marshall, J., concurring), and it was applied by the Court in its only Eighth Amendment opinion concerning the conditions of incarceration. *Gamble, supra*, 429 U.S. at 102, 97 S.Ct. 285. It is the basic test I will apply in this case.

Incarceration is the legitimate punishment for convicted felons in this State, and "[i]t is the obligation of penitentiary officials to insure that inmates are not subjected to any punishment beyond that which is necessary for the orderly administration of [the prison]." *Williams, supra*, 547 F.2d at 1214, quoting *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974).

A convicted person is not sent to a penal institution to receive additional punishment. . . . No one can reasonably contend that the "loss of liberty" involved in being incarcerated is not a substantial deprivation regardless of the conditions under which the person is held. *Barnes v. Government of Virgin Islands*, 415 F.Supp. 1218, 1224–25 (D.St.Croix 1976).

The courts have a concomitant "duty to protect the prisoner from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court." *Jackson v. Godwin*, 400 F.2d 529, 532 (5th Cir. 1968). This duty is "not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison," *Gates, supra*, 501 F.2d at 1301, and a court must intervene if prison conditions individually, or as a whole, present a grave and immediate threat to the health and well-being of the inmates. *E. g. Williams, supra*, 547 F.2d at 1212; *Newman, supra*, 503 F.2d at 1329; *Campbell v. Beto*, 460 F.2d 765, 768 (5th Cir. 1972); *Holt v. Sarver*, 309 F.Supp. 362 (E.D. Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971).

## PHYSICAL CONDITIONS OF INCARCERATION

Unsanitary and inadequate conditions have been universally condemned where they pose a threat to health and safety. Courts have looked to the general state of cleanliness of the prison, the ventilation, heating, plumbing and lighting systems, and whether or not it is permeated with foul odors, rats, vermin and other indications of unhealthy physical conditions. If

inadequate and filthy, such conditions have been found constitutionally intolerable under any theory. *E. g., Williams, supra,* 547 F.2d 1206; *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974); *Gates, supra,* 501 F.2d 1291; *Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla.1976); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala. 1976); *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D.La.1970). This is by no means an exhaustive list.

Food services have been carefully scrutinized for unhealthy conditions. Improper food storage, inadequate dishwashers, untrained personnel, the failure to supply a special diet for those who need it, open garbage tins, and leaking water lines lead to the inevitable conclusion that lack of sanitation "presents an imminent danger to the health of each and every inmate." *Pugh, supra,* 406 F.Supp. at 329. *E. g., Inmates, D.C. Jail v. Jackson,* 416 F.Supp. 119 (D.D.C.1976); *Schiro, supra,* 338 F.Supp. 1016; *Jones v. Wittenberg,* 323 F.Supp. 93 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Holt, supra,* 309 F.Supp. at 372–73. In all of the above cited cases, extensive remedial measures were ordered to ensure that food be stored, prepared and served under sanitary conditions, and that the minimal health needs of all inmates, including those who require a special diet, be met. *E. g., Goldsby v. Carnes,* 429 F.Supp. 370, 379 (W.D.Mo.1977), *supplementing* 365 F.Supp. 395, 404–05 (1973) (consent judgment); *Pugh, supra,* 406 F.Supp. at 334; *Mitchell, supra,* 421 F.Supp. at 900; *Jones v. Wittenberg,* 330 F.Supp. 707, 716 (N.D.Ohio 1971), *supplementing Jones, supra,* 323 F.Supp. 93, *aff'd sub nom., Jones v. Metzger, supra,* 456 F.2d 854.

Fire safety hazards have been ordered remedied in a number of cases. *Williams, supra,* 547 F.2d 1214; *Moore v. Janing,* 427 F.Supp. 567, 572 (D.Neb.1976); *Gates v. Collier,* 349 F.Supp. 881, 888 (N.D.Miss. 1972), *aff'd,* 501 F.2d 1291 (5th Cir 1974); *Schiro, supra,* 338 F.Supp. at 1017.

I have previously held that failure to provide physical exercise for an unreasonable period of time constitutes a threat to the well-being of the prisoners. It also exhibits a calloused indifference to the health needs of a captive population. It is, therefore, cruel and unusual punishment. *Nadeau, supra,* 423 F.Supp. at 1269. A lack of adequate facilities for exercise poses a similar threat. A few courts have ordered jail officials to offer pretrial detainees opportunities for outdoor exercise regardless of the cost. *E. g., Moore, supra,* 427 F.Supp. at 575; *Rhem v. Malcolm,* 371 F.Supp. 594, 626–27 (S.D.N.Y.), *aff'd in relev. part,* 507 F.2d 333 (2d Cir. 1974); *Taylor v. Sterrett,* 344 F.Supp. 411, 422 (N.D. Tex.1972), *aff'd in relev. part,* 499 F.2d 367 (5th Cir. 1974), *cert. den.,* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975); *Hamilton v. Love,* 328 F.Supp. 1182, 1193 (E.D.Ark. 1971). The cases concerning convicted persons are generally more conservative in scope. *See, e. g., Inmates, D.C. Jail, supra,* 416 F.Supp. at 124; *Spain v. Procunier,* 408 F.Supp. 534 (N.D.Cal.1976); *Pugh, supra,* 406 F.Supp. at 335; *Battle v. Anderson,* 376 F.Supp. 402, 432 (D.Okl.1974). *See Cotton v. Hutto,* 540 F.2d 412 (8th Cir. 1976).

Nevertheless, the right to reasonable opportunities for exercise is fundamental, *Rhem, supra,* 371 F.Supp. at 627, and does not vary with the status of the confined person, stemming, as it does, from the Eighth Amendment's implicit guarantee that an incarcerated person's physical needs will be met. *Cf. Gamble, supra,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. What does vary with the status of the confined person is the standard by which the reasonableness of the opportunity is measured; a convict is entitled to such opportunities as satisfy his health needs. The Constitution does not demand sophisticated athletic equipment or an Olympic style gym; it does require that sufficient opportunities be offered all inmates so that they can keep physically fit.

While neither overcrowding nor a basic lack of privacy exists at NHSP, the court notes that the living space allowed plaintiffs is at the bottom line of acceptable living quarters. Most of the jails and prisons challenged in federal courts have been

marked by horrendous overcrowding. *E. g., Williams, supra,* 547 F.2d 1206; *Finney, supra,* 505 F.2d 194; *Gates, supra,* 501 F.2d 1291; *Inmates, D.C. Jail, supra,* 416 F.Supp. 119; *Pugh, supra,* 406 F.Supp. 318. A few courts have determined constitutionally minimum per prisoner space requirements. *Williams, supra,* 547 F.2d at 1215 (80 square feet); *Inmates, D.C. Jail, supra,* 416 F.Supp. 119 (48 square feet); *Gates v. Collier,* 390 F.Supp. 482, 486 (N.D.Miss.1975), *aff'd,* 525 F.2d 965 (5th Cir. 1976) (50 square feet). These space allowances were mandated for either barrack-type dormitories or several-person cells where "lack of space and lack of privacy cause extreme discomfort." *Moore, supra,* 427 F.Supp. at 572. *See Wolfish, supra,* 428 F.Supp. at 338–39. While plaintiffs have not challenged the size of the cells, it is a factor to be weighed by the court in determining the recreation and exercise requirements at NHSP.

■ Segregation cells also must meet minimum standards, but so long as the conditions of isolation cannot be characterized as foul, inhuman or in violation of basic concepts of decency, solitary confinement *per se* is not cruel and unusual punishment.

> Segregated confinement involving neither intolerable isolation nor inadequate food, heat, sanitation, lighting or bedding, does not fall within the former category [of cruel and unusual punishment]. It may be a necessary tool of prison discipline, both to punish infractions and to control and perhaps protect inmates whose presence within the general population would create unmanageable risks.

*O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir. 1974).

■ Courts have universally condemned conditions of segregation inimicable to the inmate-occupants' physical health, and, in some instances, have also considered conditions that jeopardize the mental health or stability of the inmates so confined. The touchstone, in either case, is the health of the inmate; while the prison administration may punish, it may not do so in such a manner as threatens the physical and mental health of prisoners. *Op. cit.*

There exists a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence. We think this is the minimal line separating cruel and unusual punishment from conduct that is not. *Finney, supra,* 505 F.2d at 207.

■ An isolation cell must be sanitary, adequately lighted and ventilated. The temperature must be reasonable. Inmates must be provided with bedding and basic materials necessary for personal hygiene, and they may not be stripped to their underwear or naked unless there is an overriding security need or medical reason. Inmates may not be subjected to severe deprivations over a long period of time. *E. g., Finney, supra,* 505 F.2d at 207–08; *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972), *cert. den.,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *Wright v. McMann,* 387 F.2d 519, 525 (2d Cir. 1967); *Aikens v. Lash,* 371 F.Supp. 482 (N.D.Ind.1974), *aff'd sub nom., Aikens v. Jenkins,* 534 F.2d 751 (7th Cir. 1976); *Johnson v. Anderson,* 370 F.Supp. 1373, 1387 (D.Del.1974); *Knuckles v. Prasse,* 302 F.Supp. 1036, 1061–62 (E.D. Pa.1969), *aff'd,* 435 F.2d 1255 (3d Cir. 1970), *cert. den.,* 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971); *Jordan v. Fitzharris,* 257 F.Supp. 674 (N.D.Cal.1966).

■ One common theme present in the solitary confinement cases is that when the deprivation of basic elements of hygiene and the presence of unsanitary conditions in the cells threaten the health of the occupants, the Constitution is violated. *See Novak v. Beto,* 453 F.2d 661 (5th Cir. 1971). This concern for the health of inmates isolated from the rest of the population dictates that adequate medical attention must be given prisoners in solitary, and they must be given sufficient opportunities to exercise. *E. g., Kirby v. Blackledge,* 530 F.2d 583 (4th Cir. 1976); *Osborn v. Manson,* 359 F.Supp. 1107 (D.Conn.1973); *Sinclair v. Henderson,* 331 F.Supp. 1123, 1131 (E.D.La. 1971); *Jones, supra,* 323 F.Supp. 93.

Several courts have also expressed concern with the impact of long periods of isolation in spartan conditions upon the mental stability and sanity of the inmates.

"The subhuman conditions alleged [and substantially proved] by Wright to exist in the 'strip cell' at Dannemora could only serve to destroy completely the spirit and undermine the sanity of the prisoner." *Wright v. McMann*, 460 F.2d 126, 130–31 (2d Cir. 1972), quoting *Wright, supra*, 387 F.2d at 526.

*See also Aikens, supra*, 371 F.Supp. at 498; *Osborn, supra*, 359 F.Supp. at 1111. "Coerced stagnation," while permissible without more for at least short periods of time, when suffered in conjunction with physical deprivations, such as outlined above, can "seriously threaten the physical and mental soundness of [the cell's] unfortunate occupant." *LaReau, supra*, 473 F.2d at 978. *See also O'Brien, supra*, 489 F.2d at 944; *Battle, supra*, 376 F.Supp. at 422.

Therefore, it is both the physical and mental well-being of the inmates that must be considered in judging whether or not the conditions of defendants' three types of isolation cells run afoul of the Eight Amendment's proscription against cruel and unusual punishment.

## MEDICAL CARE

The duty to, provide a habitable place to live is akin to "the government's obligation to provide medical care for those whom it is punishing by incarceration." *Gamble, supra*, 429 U.S. at 103, 97 S.Ct. at 290. But the Supreme Court cautioned that it is against the "wanton infliction of unnecessary pain" that the Eighth Amendment guards, not simple "inadvertent failure to provide adequate medical care." *Id.* at 105, 97 S.Ct. at 292. Deliberate or calloused indifference to serious medical needs may be evinced: by the treating physician, *e. g.*, *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974); *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir. 1970), *cert. den.*, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971); by prison guards, *e. g.*, *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976); *Mitchell v. Chester*

*County Farms Prison*, 426 F.Supp. 271 (E.D. Pa.1976); or the administration, *e. g., Newman, supra*, 503 F.2d 1320; *Tolbert v. Eyman*, 434 F.2d 625 (9th Cir. 1970); *Monroe v. Bombard*, 422 F.Supp. 211 (S.D.N.Y. 1976).

█ Traditionally, in the Section 1983 context, a plaintiff must show not only that the defendant was callously indifferent to his or her medical needs, but that those needs were serious and that the failure to treat them resulted in considerable harm. It is "not every injury or illness [that] invokes the constitutional protection—only those that are 'serious' have that effect." *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3d Cir. 1976). *See also Hoitt, supra*, 497 F.2d 598; *Page v. Sharpe*, 487 F.2d 567 (1st Cir. 1973).

A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See, e. g., Hampton, supra*, 546 F.2d 1077; *Sawyer v. Sigler*, 445 F.2d 818 (8th Cir. 1971); *Tolbert, supra*, 434 F.2d 625; *Monroe, supra*, 422 F.Supp. 211. Even elective treatment recommended by a physician but not "necessary" in life or health saving sense, may be constitutionally mandated upon a prisoner's election. *Derrickson v. Keve*, 390 F.Supp. 905 (D.Del.1975).

█ Underlying these opinions is the recognition that the government's affirmative duty to provide reasonable medical care arises because the inmate is reduced to a state of complete medical dependency upon the prison authorities. *Gamble, supra*, 429 U.S. at 103, 97 S.Ct. 285; *Newman, supra*, 503 F.2d at 1329. This imposed dependency is a characteristic of all prisoners and, as a class, they may attack as constitutionally deficient a system upon which they are forced to depend for their life and health needs. *E. g., Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854 (4th Cir. 1975); *Finney, supra*, 505 F.2d 194; *Newman, supra*, 503 F.2d 1320; *Gates, supra*, 501 F.2d 1291; *Martinez Rodriguez v. Jimenez*, 409

F.Supp. 582 (D.P.R.1976), *aff'd* 537 F.2d 1 (1st Cir. 1976).

█ Nor need prison inmates wait until the harm they suffer from the lack of medical attention is so egregious as to independently "shock the conscience." If the medical system provided inmates by the state presents a "grave and immediate health danger to the physical well-being," *Campbell, supra*, 460 F.2d 765, the state's failure to fulfill its affirmative duty violates the Eighth Amendment and prisoners need not await the inevitable harm. *Cf. Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973).

Plaintiffs here have not testified of medical horror stories approaching in magnitude those detailed in some of the cases. *E. g., Newman, supra*, 503 F.2d at 1324; *Martinez Rodriguez, supra*, 409 F.Supp. 582. Under the holding of *Gamble*, this court precluded plaintiffs from showing instances of medical problems that were diagnosed and treated by the prison physician on the theory that such complaints were tort, not civil rights actions, over which this court does not have jurisdiction. Nevertheless, plaintiffs have established that serious medical problems have not been treated and that some of these conditions, if untreated, may result in permanent damage or require corrective surgery. But, more importantly, plaintiffs have shown that small medical complaints are routinely ignored, that they suffer daily indignities, humiliation and pain as a result of a medical access system that is inadequate. In addition, they have established that the medical staff, equipment, facilities and budget are so insufficient as to create a time bomb in terms of endangering the inmates' health and well-being. I must, therefore, determine whether or not the systemic deficiencies in defendants' medical system evidence such a calloused and deliberate indifference on the part of defendants as to plaintiffs' health needs as to violate the Eighth Amendment.

█ An inmate's dependency upon the prison's medical system includes, of necessity, the diagnostic stage of medical treatment. The failure to discover and/or diagnose serious medical problems can lead to the same evils as does the lack of therapeutic attention once an illness or injury is known. If one is to be considered as a shocking failure on the part of the government to fulfill its duty to provide adequate medical care, so must the initial failure of the system to provide for discovery of latent and incubating diseases and medical problems. Furthermore, the systemic absence of complete routine physical examinations, blood tests, syphilis tests, and other ordinary preventative medical measures can endanger the entirè prison community. *See Mitchell, supra*, 421 F.Supp. 886; *Martinez Rodriguez, supra*, 409 F.Supp. 582; *Gates, supra*, 349 F.Supp. 881; *Schiro, supra*, 338 F.Supp. 1016; *Jones, supra*, 330 F.Supp. 707. *Contra, Collins v. Schoonfield*, 344 F.Supp. 257.[7]

█ Staff shortages render medical services below constitutional muster if the shortage is such that it endangers the health of the inmate population by either a lack of medical coverage or by use of unqualified persons to staff the facility. *Finney, supra*, 505 F.2d at 202–04; *Newman, supra*, 503 F.2d 1320; *Gates, supra*, 501 F.2d 1291; *Mitchell, supra,* 421 F.Supp. at 890; *Martinez Rodriguez, supra,* 409 F.Supp. at 588; *Dillard v. Pitchess*, 399 F.Supp. 1225, 1237–38; *Battle, supra*, 376 F.Supp. at 415–16.

█ The courts which have ordered additional medical staff have not relied upon the ratios of staff to inmates, which, unlike here, were sometimes truly shocking. Instead, the underlying concept is that inmates are entitled to qualified medical coverage at all times, sufficient to meet both their routine and emergency health care needs. A failure to staff a prison around

---

7. While most of these cases concern medical services of jails, the plaintiff class in each one included sentenced inmates, and in none of the cases did the court rely upon the fact that the plaintiff class was mostly pretrial detainees in finding constitutional deficiencies in the intake examination stage.

the clock with qualified personnel trained to identify and cope with medical emergencies and reliance upon unqualified and untrained inmates, civilians and employees of the prison to make medical decisions and to perform medical functions infringe upon the constitutional rights of prisoners. *Finney, supra,* 505 F.2d at 202; *Newman supra,* 503 F.2d at 1323; *Gates, supra,* 501 F.2d 1291; *Mitchell, supra,* 421 F.Supp. at 890; *Martinez Rodriguez, supra,* 409 F.Supp. at 588; *Dillard, supra,* 399 F.Supp. at 1237–38; *Battle, supra,* 376 F.Supp. at 415–16; *Collins, supra,* 344 F.Supp. at 277. In the instant case, untrained personnel determine the prisoners' access to the medical services and deliver medications to them. Both are medical functions that must be performed by medically trained personnel. *See Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir. 1974).

Insufficient staff often leads to inadequate medical records. Inadequate records in an institution, which relies upon transfers to outside medical facilities for extended or extensive medical care, are a hazard to the health of the patient inmates.

> The consequences of inadequate medical records are manifest in two ways. First, because inmates transferred to [a medical facility] are accompanied by paltry records, personnel at the receiving institution are unaware of the diagnosis, treatment previously rendered, and the treatment prescribed for the future. Second, there can be little or no monitoring of whether receiving facilities are complying with a physician's orders. *Newman, supra,* 503 F.2d at 1323 n. 4.

*See also Finney, supra,* 505 F.2d at 203; *Martinez Rodriguez, supra,* 409 F.Supp. at 588.

■ Inmates are entitled to reasonable dental care. *Stokes v. Hurdle,* 393 F.Supp. 757 (D.Md.1975), aff'd, 535 F.2d 1250 (4th Cir. 1976); *Blakey v. Sheriff of Albemarle County,* 370 F.Supp. 814 (W.D.Va.1974).

■ A more recently developed line of cases has recognized that there is

> [n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.

\* \* \* \* \* \*

We therefore hold that [the plaintiff] (or any other prison inmate) is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial. The right to treatment is, of course, limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable. *Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir. 1977).

The absence of psychological or psychiatric care has been noted in many cases in which the medical care facilities of the prison in question were found inadequate under the Eighth Amendment. *E. g., Finney, supra,* 505 F.2d at 204 citing *Newman v. State of Alabama,* 349 F.Supp. 278, 287 (M.D.Ala. 1972), aff'd, *Newman, supra,* 503 F.2d 1320; *Mitchell, supra,* 421 F.Supp. at 891; *Battle, supra,* 376 F.Supp. at 415, 434; *Collins, supra,* 344 F.Supp. at 277. Behind the vanguard of three Circuit Courts of Appeal and numerous District Courts, I hold that prison inmates are entitled to reasonable psychiatric and/or psychological treatment when medically necessary, and that defendants are under an affirmative duty to provide such care to inmates diagnosed as needing it in conformity with the *Bowring* test quoted above.

Inadequate facilities, equipment and medication supplies hamper the delivery of reasonable medical care. The adequacy of medical facilities can be judged, however, only in reference to the task to be accomplished. Prison facilities can be an infirmary able to take care of only routine minor

medical complaints, but with the capability of identifying long-term or emergency medical needs and transferring patients to a hospital or better equipped facility on an emergency basis. At the other end of the spectrum, a prison can have a fully equipped small hospital which would transfer out only cases requiring sophisticated care or equipment. Each type has its own peculiar requirements, but each must be able to meet the minimum diagnostic, routine and emergency medical needs of a prison population.

A prison infirmary requires quick exits and easy access to transportation to an outside medical facility. *See Finney, supra,* 505 F.2d at 203; *Newman, supra,* 503 F.2d at 1324; *Collins, supra,* 344 F.Supp. at 277. Adequate transportation is also necessary to enable inmate patients to have outside medical consultations with specialists unless, of course, the specialists come to the prison. *See Martinez Rodriguez,* 409 F.Supp. at 588. A hospital must be better equipped than an infirmary, and the scales are to be balanced between the necessity of and ease in transferring inmates to other facilities and the extent of the equipment required of an in-prison medical center. Minimally, today it would seem that X-ray services and the basic laboratory testing equipment are required if they cannot be obtained regularly outside the clinic. *See Finney, supra,* 505 F.2d at 203; *Gates, supra,* 501 F.2d at 1300, *aff'ing,* 349 F.Supp. at 901.

■ In either case, sufficient physical space and equipment for emergency and routine medical treatment, a ward for inmates with contagious diseases not mandating hospitalization or for other inmates who simply need to be monitored, adequate medications to satisfy the in-house needs of the inmates, and, finally, a dietary service for inmates requiring special foods are all required if the health and welfare of the prison community are to be protected. *E. g., Massey v. Hutto,* 545 F.2d 45 (8th Cir. 1976); *Westlake, supra,* 537 F.2d 857; *Finney, supra,* 505 F.2d at 203, 204; *Newman, supra,* 503 F.2d at 1331; *Gates, supra,* 501 F.2d at 1300, *aff'ing,* 349 F.Supp. at 888.

■ Lines of responsibility and authority must be clearly defined. The treating physician is ultimately responsible for the medical care actually rendered by the medical staff, and crossed lines of therapeutic responsibility can result in a patient not receiving the care prescribed by the treating doctor.

A fourth debility under which [the prison] was found to labor was the presence of disorganized lines of therapeutic responsibility. An ineluctable by-product of this condition is that treatment prescribed by doctors is not administered by medical subordinates. Since the failure of prison officials to comply with doctors' orders has occasioned judicial disapprobation, a medical organizational system pregnant with the possibility of noncompliance is similarly amenable to attack. (Cites omitted.) *Newman, supra,* 503 F.2d at 1331.

*Accord, Finney, supra,* 505 F.2d at 203; *Dillard, supra,* 399 F.Supp. at 1239; *Schiro, supra,* 338 F.Supp. at 1018. Clear lines of responsibility and authority are necessary because a patient has a right to receive the treatment and medications prescribed him by his treating physician, be it a psychiatrist or a regular doctor.

■ Finally, plaintiffs contend that drug and alcohol dependencies mandate treatment. Therapies for these conditions vary from medical to psychiatric to physical, and, to support a claim for medical treatment, there must be some proof that a cure or generally accepted mode of treatment for the condition, in fact, exists. *Smith v. Schneckloth,* 414 F.2d 680 (9th Cir. 1969); *Bresolin v. Morris,* 88 Wash.2d 167, 558 P.2d 1350, 1353 (1977). Nevertheless, as with any other condition which may mandate medical care, prison officials have a duty to diagnose and treat serious medical needs, even though they are symptoms such as withdrawal pains or cirrhosis of the liver, ulcers or delirium tremens. And, the treatment and medications prescribed by the patient's physician must be provided so long as they are based on medical necessity. *Cf.*

*Bowring, supra,* 551 F.2d 44; *Barnes, supra,* 415 F.Supp. at 1228; *Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 677 (pretrial detainees and convicted persons); *Miller v. Carson,* 401 F.Supp. 835, 879 (M.D. Fla.1975) (pretrial detainees and convicted persons); *United States ex rel. Ingram v. Montgomery County Prison Board,* 369 F.Supp. 873, 876 (E.D.Pa.1974).

In conclusion, the measure by which defendants' medical care services and the system of access to them are to be judged is whether or not defendants' facilities, acts or omissions, overall, endanger the health of the prison community in such a manner as to evince a deliberate and calloused disregard of the serious medical needs of plaintiffs. The medical unit must be looked at as a whole because it is the end result, the total health care made available to and received by the plaintiff class which is subject to constitutional scrutiny by this court.

## DEBILITATING CONDITIONS OF INCARCERATION

The Eighth Amendment "proscribes more than physically barbarous punishments." *Gamble, supra,* 429 U.S. at 102, 97 S.Ct. at 290. Imprisonment may not be marked by conditions which inflict needless suffering whether or not the pain is physical. Conditions which cause such deprivations must be justified by the legitimate penological objectives of the corrections system. *See Gregg, supra,* 428 U.S. at 183, 96 S.Ct. 2909.

An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses. This isolation, of course, also serves a protective function by quarantining criminal offenders for a given period of time while, it is hoped, the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity. Thus, since most offenders will eventually return to society, another paramount objective of the corrections system is the rehabilitation of those committed to its custody. Finally, central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. *Pell, supra,* 417 U.S. at 822–23, 94 S.Ct. at 2804.

While the United States Supreme Court has given no one of these goals primacy, New Hampshire, in its Constitution, statutory provisions and by judicial pronouncements, has emphasized that "the true design of all punishments [is] to reform, not to exterminate mankind." N.H.Const. pt. 1, art. 18. The prison is established "for the punishment and reformation of criminals . . ." NH RSA 622:1. The Trustees of the prison are specifically empowered to "[provide] for the health and comfort of the officers and prisoners," and to "provide such books and other instruction as shall be deemed necessary for the convicts." NH RSA 622:5 IV and IX. The New Hampshire Supreme Court has outlined New Hampshire's penal objectives, emphasizing the social and individual purpose of rehabilitation.

Sentencing has two purposes. Its immediate goal is the protection of society against the commission of future crimes, whether by the particular defendant being sentenced or by others whom the sentence is supposed to deter. The ultimate goal of sentencing is to rehabilitate the offender—a goal as important to society as it is to the individual. (Cites omitted.) *State v. Belanger,* 114 N.H. 616, 619, 325 A.2d 789, 791 (1974).

*See also State v. Lemire,* 115 N.H. 526, 534, 345 A.2d 906 (1975); *State v. Streeter,* 113 N.H. 402, 308 A.2d 535 (1973); *State v. Burroughs,* 113 N.H. 21, 300 A.2d 315 (1973). While these provisions are statements of general purpose and intent, and may not create substantive rights, *see Lombardo v. Meachum,* 548 F.2d 13, 15 (1st Cir. 1977), it is clear that New Hampshire espouses reform as a primary goal of its correctional system.

Thus far, no court has recognized a federal constitutional right to rehabilitation in the sense that an individual has a positive right to leave a penitentiary equipped to function as a law abiding member of society. However, there is a growing recognition that convicts have a right to be incarcerated in conditions that:

First, do not threaten their sanity or mental well-being, see, e. g., Wright, supra, 387 F.2d 519; Aikens, supra, 371 F.Supp. 482; Osborn, supra, 359 F.Supp. 1107; Taylor, supra, 344 F.Supp. at 419;

Second, are not counterproductive to the inmates' efforts to rehabilitate themselves, Mitchell, supra, 421 F.Supp. at 895; Barnes, supra, 415 F.Supp. at 1226; Pugh, supra, 406 F.Supp. at 330; cf. Bowring, supra, 551 F.2d at 48 n. 2; French v. Heyne, 547 F.2d 994 (7th Cir. 1976);

Third, do not increase the probability of the inmates' future incarceration, Inmates, D.C. Jail, supra, 416 F.Supp. at 123; Barnes, supra, 415 F.Supp. 1218; Pugh, supra, 406 F.Supp. at 330; Taylor, supra, 344 F.Supp. 411; Holt, supra, 309 F.Supp. at 379; cf. Bowring, supra, 551 F.2d at 48 n. 2.

This emergent right is based on the dual interests of society and the individual. It plainly defeats society's interests to cultivate recidivism.

Unless society subordinates all of the correctional purposes to the goal of rehabilitation, it faces the paradox of promoting the production rather than the reduction of crime. Taylor, supra, 344 F.Supp. at 420.

Prisons in which crime ferments do not achieve any of the legitimate penological objectives outlined by the Court except for the temporary removal of the criminal from the society upon which he preys.

The inmates' interests are twofold: first, to avoid physical, mental or social degeneration, "to maintain skills already possessed," Pugh, supra, 406 F.Supp. at 330; and, second, to be free to attempt rehabilitation or the cultivation of new socially acceptable and useful skills and habits. Imprisonment in an institution where degeneration is probable and self-improvement unlikely would cause unnecessary suffering in the form of probable future incarceration. Punishment for one crime, under conditions which spawn future crimes and more punishment, serves no valid legislative purpose and is "so totally without penological justification that it results in the gratuitous infliction of suffering" in violation of the Eighth Amendment. Gamble, supra, 429 U.S. at 102–03, 97 S.Ct. at 290; Gregg, supra, 428 U.S. at 183, 96 S.Ct. 2909, 2929.

This right to be confined in conditions which do not cause degeneration is usually seen as one of degree, dependent upon factors beyond the mere failure of the state to affirmatively promote rehabilitation.

Given an otherwise unexceptional penal institution, the Court is not willing to hold that confinement in it is unconstitutional simply because the institution does not operate a school, or provide vocational training, or other rehabilitative facilities and services which many institutions now offer.

That, however, is not quite the end of the matter. The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation. Holt, supra, 309 F.Supp. at 379. Accord, McCray, supra, 509 F.2d at 1335; Finney, supra, 505 F.2d at 208–09; cf. White v. Sullivan, 368 F.Supp. 292 (S.D.Ala. 1973).

The extent of the state's affirmative duty depends, of course, upon the extent to which degeneration is probable and upon its ability to provide opportunities to the inmates in light of the other goals of the prison, but there must be

a balance between the goals of deterrence, both specific and general, rehabilitation, and internal security of the institution. This Court may not order implementation of rehabilitation programs without regard to the security of the institution. Likewise, prison officials

may not deny implementation of the same in the name of security alone.

\* \* \* \* \* \*

Corrections officials may not simply ignore rehabilitational measures for the sake of having a smoothly run institution. Though having inmates spend their days in a state of institutionally induced numb lethargy may make the task of corrections officials much easier, this cannot pass constitutional muster if rehabilitation is to have any meaning as a viable goal of a corrections system. *Barnes, supra,* 415 F.Supp. at 1225, 1226. Where, as in New Hampshire, the state has placed its constitutional imprimatur upon the goal of reform and rehabilitation, it cannot slough it off in the name of security. A balance must be reached which accommodates all the state's penal objectives, not the least of which is the reform of the criminal. *Cf. Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1975); *Finney, supra,* 505 F.2d at 208–09.

The totality of the conditions of confinement must be considered in determining the extent to which the state is obligated to provide opportunities to stave off degeneration and to minimize impediments to reform. Where "conditions create an environment in which it is impossible for inmates to rehabilitate themselves—or to preserve skills and constructive attitudes already possessed—even for those who are inclined to do so," the courts have not been shy and extensive remedial orders have issued. *Pugh, supra,* 406 F.Supp. at 326. *E. g., Inmates, D.C.Jail, supra,* 416 F.Supp. 119; *Mitchell, supra,* 421 F.Supp. 886; *Jones, supra,* 323 F.Supp. 93; *Holt, supra,* 309 F.Supp. 362. Programs have been ordered both where prisoners are kept so busy with arduous labor that they are afforded "almost no time for self-advancing activities or recreation," *Finney, supra,* 505 F.2d at 209, and where inmates "spend their days in a state of institutionally induced numb lethargy," *Barnes, supra,* 415 F.Supp. at 1226, and "[u]nbroken inactivity." *Pugh, supra,* 406 F.Supp. at 326. In all three cases, the dearth of significant rehabilita-

tive programs and the irrational and discriminatory allocation of the existing programs were highlighted by the courts. The basic import of these cases is that prison authorities have a duty to provide sufficient time, opportunities and encouragement to overcome the degenerative aspects of the prison in question so that at least the state takes no part in the promotion of future crime. It is against these standards that I will measure the opportunities offered by defendants at NHSP.

1. *Programs*

Idleness and boredom are condemned as conditions which cultivate debilitation and several courts have ordered each prisoner be assigned a "meaningful job based on his abilities and interests, and according to institutional needs." *Barnes, supra,* 415 F.Supp. at 1233; *Pugh, supra,* 406 F.Supp. at 335. In Alabama

[i]nmates are denied any meaningful opportunity to participate in vocational, educational or work activities. As a result, most inmates must spend substantially all of their time crowded in dormitories in absolute idleness. . . . The evidence reflects that idleness of this magnitude destroys any job skills and work habits inmates may have, and contributes to their mental and physical degeneration.

\* \* \* \* \* \*

Institutional work assignments offer little to motivate inmates. There are too few jobs and most take only a few hours to perform. Frequently many more inmates are assigned to a particular job than are required to accomplish it. Prisoners work . . . at jobs which do not teach useable skills. . . . [one prison] operates a license tag plant, and [another] has a mattress factory. Neither of these programs is available to any significant number of inmates. Other inmates who have an assigned task perform housekeeping functions for the institution. As observed, the lack of meaningful work opportunities contributes to idleness, boredom, apathy and frustration. *Pugh, supra,* 406 F.Supp. at 326–27.

The *Barnes* order was based on the court's finding that there were no meaningful work opportunities at the prison, that the inmates were not taught marketable skills, and that they were discriminatorily assigned to the work release program. *Barnes, supra*, 415 F.Supp. at 1226. *See also Taylor v. Perini*, 413 F.Supp. 189, 252 (N.D.Ohio 1976), *supplemented by* 421 F.Supp. 740, 756 (1976).

■ This court has already ruled that a New Hampshire prisoner has not only a duty to work when assigned, but a right to work under New Hampshire statutes. NH RSA 622:1, 622:7 and 651:15.[8] While this state right does not extend to a right to a "meaningful" job, it, at least, provides New Hampshire prisoners with the right to avoid the stultifying idleness condemned in *Pugh* and *Barnes*.

The torpor induced by prolonged mental and physical inactivity is not satisfactorily counteracted by hobby crafts carried on in the cells. "Opportunities for basketweaving and handicrafts, even if provided, do not compensate for the extended periods of enforced idleness and lack of fresh air and physical activity." *Moore, supra*, 427 F.Supp. at 573.

Courts have not been hesitant to order prison administrations to institute and/or expand educational, vocational training, and work study and/or work release opportunities in order to minimize degeneration and succor what rehabilitative attempts were being made by inmates. *E. g., Goldsby, supra*, 429 F.Supp. at 376 (consent decree that county jail must provide work-study release program for sentenced inmates and increase basic educational and remedial programs); *Barnes, supra*, 415 F.Supp. at 1232 (each inmate is entitled to opportunities for basic education, work release, college release or vocational training programs); *Pugh, supra*, 406 F.Supp. at 335 (each inmate shall have an opportunity to participate in basic educational, vocational training and prerelease transitional programs); *Hamilton v. Landrieu*, 351 F.Supp. 549, 552 (E.D.La.1972) (prison shall maintain a rehabilitation and education program).

Under the same rationale, at least two courts have ordered prison officials not only to supply the space, equipment and time for adequate exercise but have found that planned and organized recreation is required to counteract the effects of unconstitutional conditions of confinement. *Pugh, supra*, 406 F.Supp. at 335; *Barnes, supra*, 415 F.Supp. at 1233.

■ While each inmate must have sufficient opportunities to participate in "rehabilitative" type programs, they are not entitled to the opportunities of their choice nor are they entitled to pursue such activities at all times during their incarceration. *E. g., Shields v. Hopper*, 519 F.2d 1131 (5th Cir. 1975); *Gardner v. Johnson*, 429 F.Supp. 432 (E.D.Mich.1977); *McKinnon v. Patterson*, 425 F.Supp. 383 (S.D.N.Y.1976); *Chapman v. Plageman*, 417 F.Supp. 906 (W.D.Va. 1976). Although due process is not demanded in prison classification or program assignment decisions, *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), those decisions cannot be arbitrary, irrational or discriminatory. *Lavine v. Wright*, 423 F.Supp. 357, 362 (D.Utah 1976); *Taylor, supra*, 421 F.Supp. at 756; *Barnes, supra*, 415 F.Supp. 1218; *Pugh, supra*, 406 F.Supp. at 335.

## 2. *Classification*

An effective diagnostic and classification system enables prison officials to separate and properly handle three basic groups of inmates: prisoners who pose a threat to the safety of other inmates or the institution; those who are in need of medical or psychiatric treatment; and those who could benefit from the programs the institution offers. Problems stemming from the failure to properly classify inmates are manifold.

Prison officials do not dispute the evidence that most inmates are assigned to the various institutions, to particular dormitories, and to work assignments almost entirely on the basis of available space.

8. *See Laaman v. Helgemoe*, Civ.No. 75–258, Opinion and Order 12/30/76.

Consequently, the appreciable percentage of inmates suffering from some mental disorder is unidentified, and the mentally disturbed are dispersed throughout the prison population without receiving treatment. . . .

. . . Violent inmates are not isolated from those who are young, passive, or weak. . . .

Emotional and physical disabilities which require special attention pass unnoticed. There is no rational basis on which to assign inmates to the few vocational, educational and work opportunities which do exist. All of this contributes to the apathy, tension and frustration which pervade Alabama prisons. *Pugh, supra,* 406 F.Supp. at 324.

The state has a constitutional duty to "reasonably protect[ed] [inmates] from constant threat of violence and sexual assault by his fellow inmates, . . . " *Woodhous, supra,* 487 F.2d at 890. *McCray, supra,* 509 F.2d at 1334; *Finney, supra,* 505 F.2d at 201; *Nadeau, supra,* 423 F.Supp. at 1261. Courts have ordered prison administrators to institute at the very least, minimal classification systems which separate inmates by "age, offense, physical aggressiveness, or other criteria which would warrant separate housing arrangements." *Goldsby, supra,* 365 F.Supp. at 402, *supplemented by* 429 F.Supp. 370, 376 (1977). *E. g., McCray, supra,* 509 F.2d 1332; *Gates, supra,* 501 F.2d 1291; *Rhem, supra,* 507 F.2d at 338 (pretrial detainees); *Mitchell, supra,* 421 F.Supp. at 895; *Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 669 (S.D.Tex.1975); *Pugh, supra,* 406 F.Supp. at 324, 329; *Hamilton v. Love,* 358 F.Supp. 338, 345 (E.D.Ark.1973).

The inmate's dependency upon the prison administration for his medical needs places upon prison officials a duty to properly diagnose for and classify inmates by medical needs, alcohol or drug dependencies and psychological or psychiatric disabilities. *See Newman, supra,* 503 F.2d 1320, *affirming,* 349 F.Supp. at 287; *Pugh, supra,* 406 F.Supp. at 324, 329; *Mitchell, supra,* 421 F.Supp. at 895, 899; *Jones, supra,* 330 F.Supp. at 717.

Finally, effective classification and diagnostic procedures are "absolutely necessary if effective rehabilitation is to take place." *Barnes, supra,* 415 F.Supp. at 1232.

An inmate classification system, the heart of any correctional institution, not only determines the required custodial level of an individual but also establishes a scheme of goals to allow a person to obtain benefits from the correctional process after identifying his vocational, educational, mental and physical needs. *Anderson v. Redman,* 429 F.Supp. 1105, 1121 (D.Del.1977).

*See also Lavine, supra,* 423 F.Supp. at 362; *Mitchell, supra,* 421 F.Supp. at 895; *Alberti, supra,* 406 F.Supp. at 691; *Pugh, supra,* 406 F.Supp. at 324; *Jones, supra,* 330 F.Supp. at 715.

Therefore, classification procedures, including diagnostic testing, may be necessary to effectuate a variety of rights including the rights to be held in a reasonably safe and relatively harmless environment and the right to adequate medical care. However, it is clear that classification does not inflict a "grievous loss" upon a prison inmate even where the classification results in conditions of confinement substantially more restrictive than before. Therefore, procedural due process is not constitutionally mandated either when the prison authorities originally classify an inmate or when they change the designations already assigned. *Moody, supra,* 429 U.S. at 88 n. 9, 97 S.Ct. 274. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

### 3. Staff Training

Staff training programs have been implemented by several courts to ensure that prison employees are capable of carrying out within constitutional limits their dual roles as both security and correctional staff. They must reasonably protect the safety of all inmates and staff and guard

the institution against escape, illegal activities, disruption and violence. At the same time, they must interact on a daily basis with difficult and often unreasonable and intractable people so as not to severely aggravate the inherent stresses of incarceration. They are relied upon to counsel and guide inmates and refer them to programs or professional help when needed. They police, guard, counsel, punish and befriend at the same time. Hasty and ill-conceived responses to particular problems, although inevitable to some degree due to the complexity of the roles assumed by prison staff, can only worsen a difficult situation. Continuing inappropriate behavior by the keepers threatens both the lives, safety and sanity of the kept. Therefore, prison administrators must ensure the quality of their "front line" staff. *See Goldsby, supra,* 429 F.Supp. at 376 (staff training must emphasize psychology, intergroup conflict and prejudice); *Barnes, supra,* 415 F.Supp. at 1232 (court ordered psychological testing to determine an applicant's fitness for corrections employment and pre-service and in-service training); *Pugh, supra,* 406 F.Supp. at 335 (prison must provide appropriate and effective training programs); *Alberti, supra,* 406 F.Supp. at 678 (jail must develop training program for jail personnel); *Hamilton, supra,* 351 F.Supp. at 551 ("a bona fide pre-service training program shall be organized *outside* the prison, and an in-service training program shall be organized as an annual refresher"); *Jones, supra,* 330 F.Supp. at 716 (jail must develop a "plan for the selection and in-service training of jail personnel, which shall include as a minimum, in addition to [a required pre-service program], psychological examinations designed to disclose any gross personality defects . . . and arrangements for taking any job-related courses in community institutions at county expense").

 As a further safeguard against abuse and mistreatment, there should be an inmate grievance procedure so that complaints brought either by individuals or en masse will be dealt with by the administration. *See Taylor v. Perini,* 413 F.Supp. 189, 265 (N.D.Ohio 1976).

### 4. *Visits*

 This court has already determined that, so long as some visitation is allowed, an hourly limit on visits is not a systematic interference with familial association protected under the First Amendment and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Nevertheless, a total ban or unreasonable restrictions on visitation privileges does implicate the First Amendment rights of any inmate. *Hamilton v. Saxbe,* 428 F.Supp. 1101, 1111 (N.D.Ga.1976); *Mitchell, supra,* 421 F.Supp. at 895; *James v. Wallace,* 382 F.Supp. 1177, 1182 (M.D.Ala.1974); *Rhem, supra,* 371 F.Supp. at 625; *Mabra v. Schmidt,* 356 F.Supp. 620 (W.D.Wis.1973). *See Pell, supra,* 417 U.S. at 824–25, 94 S.Ct. 2800.

 Unreasonable restrictions on visitation also involves the Eighth Amendment where the failure to allow inmates to keep their community ties and family bonds promotes degeneration and decreases their chances of successful reintegration into society. Where there are extreme time limitations on visits, a lack of privacy and comfort in the visiting area, a prohibition against physical contact and where inmates in quarantine are allowed no visitors at all,

[t]he chances of successful rehabilitation or the chances of escaping mental and physical degeneration are also diminished by the fact that the prison environment is much different from that in the society to which an inmate must return. Current visitation policies discourage visits—which are essential to the maintenance of community ties—and therefore decrease an inmate's chances of successful reintegration upon release. *Pugh, supra,* 406 F.Supp. at 327.

*See also Thomas v. Brierley,* 481 F.2d 660 (3d Cir. 1973); *Almond v. Kent,* 459 F.2d 200 (4th Cir. 1972); *Jones, supra,* 323 F.Supp. at 97. *Cf. Thompson v. Gallagher,* 489 F.2d 443, 447 (5th Cir. 1974); *Agron v. Montanye,* 392 F.Supp. 454, 456 (W.D.N.Y. 1975).

In the totality context, as with the First Amendment, the court must study the alternative modes of communication available to a prisoner to keep alive his contacts with the outside world and look to the probable effects of a visitation policy on the physical, emotional and mental health of the inmates. Against these effects, the court must weigh the state's concerns with deterrence, security and rehabilitation, and

> [e]ach of these interests requires some restriction upon visitation: prisons can deter crime only if they are, in some degree, undesirable, and isolation from society accounts for much of this undesirability; similarly, insuring stability in the prison population and rehabilitating the prisoner both require that limitations be placed on the number and type of people admitted to the prison. *Hamilton, supra,* 428 F.Supp. at 1110.

■ Traditionally, much discretion is allowed prison officials in determining their visitation policies, *Pell, supra,* 417 U.S. at 827, 94 S.Ct. 2800, and challenges against specific restraints placed on prisoners' visits have met with little judicial success. *E. g., McCray, supra,* 509 F.2d 1332; *Moore, supra,* 427 F.Supp. at 574–75; *Farmer v. Loving,* 392 F.Supp. 27 (W.D.Va.1975), aff'd, 529 F.2d 515 (4th Cir. 1976); *Pinkston, supra,* 359 F.Supp. 95. It is only when the probable consequences of the strictures on visitation far surpass the necessary discomforts inherent in prison life that the discretion is overcome and the Eighth Amendment comes into play; the isolation caused by a visitation policy must, together with other circumstances of incarceration, actually threaten the mental and emotional stability of the inmates.

■ Prison administrators must, however, apply a visitation policy with an even hand, and the deprivation of a visit or some visits to a specific individual calls for a justification greater than that demanded by the Constitution for the formation of the overall policy.

> [T]he state's burden of justification is much heavier when it acts on an ad hoc basis . . . than when it implements

a carefully drawn regulation. *Morales v. Schmidt,* 494 F.2d 85, 87 (7th Cir. 1974) (Stevens, J., concurring).

*See Aikens v. Jenkins,* 534 F.2d 751 (7th Cir. 1976); *Hamilton, supra,* 428 F.Supp. at 1112; *Underwood v. Loving,* 391 F.Supp. 1214 (W.D.Va.1975). There may be no ad hoc selective enforcement of the rules, and the denial of a visit must be accompanied by due process procedures, including, at a minimum, notice of the denial or a meaningful written response to a request for permission to have a special visit or visitor, and an opportunity to seek review of any denial from an officer other than the one who originally denied the request. *Hamilton, supra,* 428 F.Supp. at 1112.

The visiting regulation which allows the Warden to withdraw visitation privileges for "poor conduct" has not been specifically enforced, and there is, therefore, a real question of plaintiffs' standing to pursue the issue of vagueness. However, the very presence of the regulation chills the exercise of plaintiffs' constitutional rights of communication and association which not only aggravates the vice of vagueness, but endows plaintiffs with "legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Casualty Co. v. Pacific Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), as quoted in *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). This is a class action designed by its nature to protect the interests of all members of the class. The regulation is on the books, is potentially enforceable by defendants at any time, and inhibits all members of the class regardless of whether or not it has been actually enforced against one inmate. *See Cramp v. Bd. of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Aikens, supra,* 534 F.2d at 754. *But see Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588–89, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972).

■ A rule or regulation, the violation of which can result in disciplinary proceedings must apprise inmates of the proscribed conduct. The usual rule is that a

statute or regulation must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). *See Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). No inmate could have a reasonable doubt that the violation of any written rule or regulation of the prison or of the criminal laws is "poor conduct." Beyond that, the rule is vague; no person of ordinary intelligence could reasonably understand exactly what behavior is proscribed as each enforcer will have his own idea as to exactly what conduct is "poor."

Visitation privileges may be curtailed as punishment for disciplinary infractions, but such restrictions may not be so great as to infringe upon the inmates' First Amendment rights to familial association and communication and Eighth Amendment right to be free of cruel and unusual punishment. A total denial of visits would violate all three constitutional strictures. *Pell, supra*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495; *Pugh, supra*, 406 F.Supp. at 330; *Mabra, supra*, 356 F.Supp. 620. Furthermore, restrictions on visitation privileges constitute a deprivation of liberty under the Due Process Clause of the Fourteenth Amendment and may be accomplished only in accordance with the normal disciplinary procedures of the prison. *Hamilton, supra*, 428 F.Supp. at 1112.

## MAIL

Prisoners' correspondence rights have been extensively litigated and need little exploration by this court. *Wolff, supra*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935; *Martinez, supra*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. Briefly, correspondence from attorneys-at-law, courts, government officials and, under some circumstances, the media, is privileged mail, and scrutiny of it by prison officials is restricted under the First and Sixth Amendments. Privileged incoming mail may be opened or inspected only in the presence of the inmate-addressee, *Wolff, supra*, 418 U.S. at 574, 94 S.Ct. 2963, and the inspection is limited to locating contraband; the enclosed letter may not be read or censored. Privileged outgoing mail may not be opened. These rules are, of course, subject to the Fourth Amendment whereby, if the authorities satisfy its requirements, privileged mail may be searched and seized. *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976); *Smith v. Robbins*, 454 F.2d 696 (1st Cir. 1972); *Craig, supra*, 405 F.Supp. 656.

Nonprivileged mail is not protected to the same extent. Prison officials may interfere with it if such interference furthers a substantial governmental interest unrelated to the suppression of expression, and if the limitation on First Amendment freedoms is no greater than necessary or essential to the protection of the particular governmental interest involved. If the authorities censor nonprivileged mail, the Due Process Clause of the Fourteenth Amendment commands that they give appropriate notice to the author of the message, a reasonable opportunity to challenge the censorship decision, and an ultimate determination by a disinterested party not privy to the initial judgment. *Martinez, supra*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224; *Hopkins v. Collins*, 548 F.2d 503 (4th Cir. 1977); *Taylor, supra*, 532 F.2d 462. Prison officials may inspect and peruse nonprivileged mail for contraband, but the intrusion must be as minimal as possible to protect the prisoners' First Amendment rights. Deliberate withholding of mail, copying or censorship may be accomplished only if the prison officials comply with the *Procunier* test and procedures or with Fourth Amendment requirements. *See McCray, supra*, 509 F.2d at 1336; *Taylor, supra*, 532 F.2d 462.

## TOTALITY

Even though no single condition of incarceration rises to the level of a constitutional violation, exposure to the cumulative effect of prison conditions may

subject inmates to cruel and unusual punishment. *E. g., Williams, supra*, 547 F.2d 1206; *Finney, supra*, 505 F.2d 194; *Gates, supra*, 501 F.2d 1291; *Pugh, supra*, 406 F.Supp. 318; *Holt, supra*, 309 F.Supp. 362. The factors that convince the courts that incarceration in a particular penal institution violates the Eighth Amendment vary from case to case, but certain themes emerge. The physical plant must be minimally adequate: lighting, heating, plumbing, ventilation, cell size and recreation space are all examined. The institution, and especially the food preparation and medical facilities, must be sanitary, and inmates must be provided with clean places to eat, sleep, work and play and the wherewithal to keep themselves and their cells clean. Their environment must be minimally safe: dangers are presented by the presence of the mentally deranged, the violent and the diseased; by the presence of rats, insects and other vermin; by the absence of fire fighting equipment and adequate emergency exits and plans. The administration must provide adequate clothing, nutrition, bedding, medical, dental and mental health care, visitation time, exercise and recreation. Each prisoner is entitled to a minimal amount of either private or semi-private space. Idleness and obstructions to self-improvement are not tolerable. And, finally, inmates may not occupy positions of power with authority over other prisoners or fulfill functions for which they are not qualified. The prison must have, both in quality and quantity, sufficient staff to maintain minimal control over the institution.

██ These are the basic constitutional rules, and the blatant violation of any one of them can result in federal intervention. Moreover, repetitive and numerous, individually insignificant trespasses over most or all of the lines can accrete into a constitutionally intolerable environment. The touchstone is the effect upon the imprisoned. Where the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration, a federal court must conclude that imprisonment under such conditions does violence to our societal notions of the intrinsic worth and dignity of human beings and, therefore, contravenes the Eighth Amendment's proscription against cruel and unusual punishment.

## SPECIFIC FINDINGS AND RULINGS

### I. *Physical Conditions*

1. The physical plant is old and antiquated and in some respects dilapidated; however, if its facilities were efficiently and thoughtfully utilized, it would be perfectly adequate for the number of prisoners it now houses.

██ 2. While the food services have been a danger to the health and safety of the inmates and staff, and are now deplorable, the present kitchen, as a temporary adjustment pursuant to an overall penological plan, does not violate plaintiffs' right to adequate and hygienic food services. But the failure to ensure sanitary conditions of the temporary kitchen and its adjunct facilities, and the health and cleanliness of all kitchen personnel, whether inmate, guard or civilian, violates the prisoners' right to live in conditions that are not a threat to their physical health.

██ 3. All isolation cells at NHSP violate the Eighth Amendment's proscription against cruel and unusual punishment, and, with or without improvements, cannot be suffered in a society governed by our Constitution.

██ 4. There is a clear and present danger of serious loss of life of both inmates and staff at NHSP due to the combined effects of a partially combustible physical plant, inadequate fire protections, the lack of an emergency evacuation plan, the lack of a master locking system and possession by inmates of lighter fluid. This situation violates the rights of the prisoners to a reasonably safe place of confinement.

5. Many of the problems at NHSP, especially the pervasive and inexcusable unsani-

tary conditions, were the result of mismanagement of the prison. This court assumes that, with the new administration, the problems specifically outlined in this opinion and by defendants' consultants will not repeat themselves.

II. *Medical Care*—The medical services and facilities at NHSP are deficient and, as such, endanger the lives and the health of the prison community.

1. The medical services and facilities are ill-defined and, as a result, are inadequate as either a prison infirmary or a hospital. As an infirmary, the facilities are misplaced and need to be closer to ambulance service, and medical transfers are impeded by NH RSA 623:1. As a hospital, the facilities are totally insufficient.

2. Adequate entering physical examinations and routine physical checkups are not conducted. The result is that defendants are not sufficiently apprised of the medical needs of the prisoners.

3. There is insufficient space and insufficient access to equipment to meet the routine and emergency medical needs of the prisoners.

4. The size of the staff is insufficient. There is not enough personnel to provide around the clock medical coverage or to allow for sick leave or vacations. The prison physician is overworked and has little time for administrative activities. He has done a yeoman's job in an extremely demanding setting and has shown his dedication to the task by supplementing an inadequate budget with his own money.

5. The lack of an emergency call or intercom system and the location of the nurse's station prevents adequate care of ward patients and endangers their lives and health.

6. The medication budget is insufficient to meet the medical needs of the inmates.

7. The sick slip system of access to medical services is totally inadequate to apprise the medical personnel of the serious medical needs of the prisoners.

8. It endangers the health of the inmates to have medications dispensed to them by medically untrained persons.

9. The medical records are inadequate.

10. Prisoners for whom special diets are medically necessary do not receive them and are thereby deprived of reasonable medical care.

III. *Mental Health*—The inmates at NHSP have a constitutional right to medically necessary mental health care which is not being met despite a highly dedicated staff.

1. The number of personnel is insufficient to meet the emergency and on-going serious mental health care needs of the inmates.

2. Due mostly to the shortage of staff, the diagnostic services are inadequate to apprise the mental health personnel of the mental health care needs of incoming inmates.

IV. Defendants' plans and descriptions of the quarantine period, classification, medical and mental health diagnosis and care, jobs and the general programs are not, in fact, being carried out.

V. Defendants' present visitation schedule offends no constitutional command, but the limitations placed on physical contact and privacy are obstacles to maintaining family and societal bonds.

VI. Although limited, the gym and present yard could, with some planning and imagination, provide sufficient recreational space to satisfy the prisoners' needs for physical activity. But given the physical shortcomings, the small cells in which plaintiffs live and the long New Hampshire winters, the expertise of a recreation director and a sufficient budget are necessary if defendants are to provide recreation and exercise that meet constitutional standards.

VII. *Debilitating Conditions*—The totality of the conditions of confinement, including, but not limited to, the traumatic introduction to prison life in the quarantine period, the failure to diagnose, classify and separate the violent, deranged and diseased from the general population, the lack of

adequate medical and mental health care services, the pervasive idleness and inactivity of inmates, both with and without jobs, the scarcity of any meaningful vocational training, educational, recreational or religious programs, the lack of sufficient personnel for the medical, mental health, work, vocational and educational services, the restrictions on visitation, the dirty, dark, brooding physical buildings whose inadequacies are magnified by mismanagement and lack of care, the disregard for the safety of the inmates in terms of fire or other general emergency, the lack of leadership and training for custodial staff, and, last but not least, the promises of programs, opportunities and treatment without fulfillment or follow-up leads this court to conclude that, as a result of their incarceration at NHSP, plaintiffs lose whatever useful and acceptable skills and attitudes they had before they entered prison and become entrapped in the criminal culture. Deep anger and hatred of the society that relegates prisoners in the name of reform to cages with nothing to do, frustration and hostility engendered by false promises, and the loss of pride and self-esteem inherent in such a degrading experience spawn anti-authoritarian and often violent criminal behavior. Time at NHSP costs a man more than part of his life; it robs him of his skills, his ability to cope with society in a civilized manner, and, most importantly, his essential human dignity.

Degeneration is hastened at NHSP by the impediments placed in the way of inmates who try to gain something positive during their imprisonment. Inmates must apply for all programs, even mental health treatment, and requests go unanswered for weeks. Treatment programs are all but physically inaccessible, and the treatment staff are kept so busy with other duties that little time can be devoted to their main task. Deprived of their ability to earn money, except for a pittance, inmates must purchase not only personal hygiene essentials, but educational tests, correspondence courses and the materials for their hobby crafts. Instruction by outside teachers costs an inmate a visit. The frustrating experience of the few motivated inmates can only reinforce and encourage the deviant inmate culture and values. I conclude that the conditions at NHSP make degeneration probable and reform unlikely.

VIII. *Mail*—While the present regulations conform generally to the constitutional mandates outlined in *Wolff, supra*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and *Martinez, supra*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224, prisoner mail has been copied without compliance with those procedures.

IX. *Harassment*—Plaintiff Laaman has been harassed by the prison administration and guards for the exercise of his right of access to the courts under the First, Sixth and Fourteenth Amendments.

X. *Cell Search*—The August, 1975, cell searches conducted during the emergency lockup were not done in an unreasonable or wanton manner, and no violation of plaintiffs' Fourth Amendment rights occurred.

XI. NH RSA 623:1 is unconstitutional insofar as it inhibits, hinders or prevents any medically necessary transfer of any prisoner from NHSP to any medical facility. This includes transfers necessary for diagnostic, routine and emergency medical and mental health care.

ORDER

IT IS ORDERED, ADJUDGED AND DECREED that:

1. Defendants, the Warden of New Hampshire State Prison, members of the Board of Trustees of the New Hampshire State Prison, and the Prison Physician of the New Hampshire State Prison, their agents, employees, successors in office and any others acting in concert with them, be and each is hereby enjoined from failing to implement fully and within the times prescribed each of the requirements set forth in this order.

2. The defendants, within ninety days from this date, shall submit to this court a detailed plan as to how they intend to implement each and every requirement of this order.

3. Jurisdiction of this case is specifically retained.

## I. *Sanitation*

1. Defendants shall maintain the entire facility, including, but not limited to, kitchen, dining, medical areas, housing areas, and industrial, recreational and administrative areas in accordance with the standards of the New Hampshire Department of Public Health and all other applicable laws, codes and regulations. Defendants shall arrange to have the Department inspect the entire facility on a regular basis, but not less than once every six months. Reports received from said Department will be implemented by defendants.

2. Defendants shall provide each prisoner with the appropriate supplies to keep his cell clean.

## II. *Physical Facilities*

1. The following physical facilities shall not be utilized to confine prisoners for any purpose: the "hospital" or "death" cell; the padded mental health cell; and the punitive isolation or "solitary confinement" cells. These cells are all located in the West Wing.

2. The "treatment" cells in the West Wing may be used for housing purposes so long as the doors to the cells are left open at all times.

## III. *Segregation and Isolation*

1. Confinement in isolation shall be imposed as punishment only after compliance with the requirements of due process as set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

2. Each cell utilized for segregation or isolation shall be equipped with a toilet which can be flushed from the inside, a sink with hot and cold running water, ventilation and lighting which meet minimum standards of the New Hampshire Department of Public Health, clean linen and a blanket, and a bed and mattress off the floor.

3. Each inmate confined in isolation shall be:

a. Permitted to bathe every day;

b. Provided three wholesome and nutritious meals per day, served with eating and drinking utensils;

c. Supplied the same toilet articles and linens as are required to be provided to the general inmate population;

d. Allowed at least thirty minutes exercise per day;

e. Afforded adequate medical and mental health care, including an examination by a qualified medical care professional at least every day.

4. No person shall be kept in isolation for more than fourteen consecutive days.

## IV. *Food Service*

1. Every prisoner is entitled to three wholesome and nutritious meals per day, served with proper eating and drinking utensils.

2. The food served to prisoners shall be properly prepared under the direction of a qualified and trained dietitian who shall plan menus, assist in food preparation, purchasing and sanitation.

3. Food shall be stored, prepared and served under sanitary conditions which meet state public health standards. Equipment shall be maintained in good working condition. All kitchen employees shall be trained in the handling of food, and those who assist in the preparation of food shall receive training in food preparation. All persons who assist in the preparation and serving of food shall be medically examined prior to such job assignment to determine their suitability for such work.

4. Each prisoner who requires a special diet for reasons of health or religion shall be provided a diet to meet his individual need.

## V. *Fire Hazard*

1. Defendants shall consult immediately with the State Fire Marshall and any other appropriate person, agency or board concerning fire hazards, fire safety equipment and exits, and emergency evacuation plans,

and shall submit to this court in no less than three months a plan detailing the steps taken and to be taken to correct the present situation at NHSP.

2. Plaintiffs and defendants shall, within thirty days, agree upon an expert to advise the court on the advisability and feasibility of installing a master locking system in the Main Cell Block and the Annex.

### VI. *Staff*

1. Qualified staff sufficient to maintain institutional order and to administer the services and programs mandated by this order shall be employed by defendants.

2. Defendants shall provide appropriate and effective training programs for all staff members, including a comprehensive program to train custodial staff before they are assigned to a position.

3. Defendants shall maintain and distribute current post orders for all custodial positions.

### VII. *Medical Care*

1. Defendants shall take immediate steps to fulfill the right of NHSP prisoners to adequate medical care. This shall include services providing for their physical and mental well-being as well as treatment for specific diseases or infirmities. Defendants shall submit to this court, within ninety days, a plan detailing exactly what function the NHSP medical services will be designed to fulfill and how they plan to care for plaintiffs' serious medical needs in accordance with the views expressed in this opinion.

2. Such medical care shall include the following:

a. Establishment of a Chief of Medical Services, who shall be a physician licensed in New Hampshire, and who shall be responsible for medical and mental health services;

b. A prompt medical examination and medical history by a physician upon commitment. Said examination and history shall be directed to the discovery of physical or mental illness; the segregation of prisoners suspected of infectious or contagious conditions; the noting of any recommendation for treatment of physical or mental defects which create special problems for the prisoner; and the determination of the physical capacity of the prisoner for work;

c. Annual medical reexamination;

d. Medical services performed and medication dispensed solely by a medical staff with appropriate training and license under the supervision of a licensed physician. The staff shall consist of a full-time physician and five licensed nurses or qualified paramedics. A minimum of two of the medical staff shall be male;

e. Emergency medical care on a twenty-four hour basis, seven days a week;

f. A member of the medical staff present at NHSP at all times;

g. Transfer upon approval of the Chief of Medical Services for necessary medical care and services to accredited hospitals, medical specialists, and the New Hampshire Hospital;

h. Complete and accurate records documenting all medical examinations, medical findings, and medical treatment maintained pursuant to standards established by the American Medical Association, under the supervision of the physician in charge;

i. The prescription, dispensing, and administration of all medication under medical supervision; no custodial staff shall dispense or administer medication except in an emergency;

j. A sick call procedure. A prisoner's need for medical and mental health care should be determined only by a licensed physician or a member of the medical staff, and the correctional staff shall not be authorized or allowed to inhibit a prisoner's access to medical personnel or to interfere with medical treatment. The sick call procedure shall be monitored by the Warden and Chief of Medical Serv-

ices to ensure that all requests are promptly brought to the attention of the medical staff. A record of all medical requests shall be maintained;

k. An examination room of sufficient size;

l. Some privacy for each bed in the ward, unless medically undesirable;

m. An intercom system in the medical services facility;

n. A nurse's station located so that adequate monitoring of the patients in the ward is possible.

3. Prisoners housed in segregation, isolation or any other status that systematically prevents them, for whatever reason, from attending sick call shall be visited once every day by a member of the medical or mental health staff.

4. The Chief of Medical Services shall report to the Warden whenever he considers a prisoner's physical or mental health has been or will be adversely affected by continued imprisonment or by any condition of confinement. All NHSP staff shall be informed that any problem relative to a prisoner's physical or mental health shall be reported to the Chief of Medical Services or a member of the medical staff.

5. All medications deemed medically necessary by a prison physician shall be given to the patient. An insufficient budget shall not excuse failure to provide necessary medications, and medications shall not be denied a prisoner because of a disagreement between prison physicians unless the Chief of Medical Services determines that to administer a prescribed medication would endanger the health of the patient or threaten the security of the institution.

6. The medical facility shall be licensed and shall be inspected on a regular basis by the Department of Public Health of the New Hampshire Department of Health and Welfare.

7. The Chief of Medical Services and the Warden are responsible for the promulgation, implementation and review of written regulations which detail the operations and procedures of the NHSP medical facility,

medical care, medical services and medical treatment. These written regulations shall include sections detailing each of the above-noted provisions.

VIII. *Mental Health Care*

1. Defendants shall immediately establish, by means of psychiatric and psychological testing and interviews, the actual mental health care needs of the prison population. Defendants shall file with plaintiffs and this court, within six months, the results of said testing, and shall, at the same time, submit a plan as to how to satisfy the needs established by the study. Defendants shall immediately hire a psychiatrist or Ph.D. psychologist and sufficiently qualified support staff to conduct said survey.

2. Defendants shall establish an ongoing procedure to identify those prisoners who, by reason of psychological disturbance or mental retardation, require care in facilities designed for such persons. Such persons shall be transferred as soon as the necessary arrangements can be made.

3. Defendants shall establish ongoing procedures, including, but not limited to, a psychiatric interview during the quarantine period to identify those prisoners who require mental health care within the institution and shall make arrangements for the implementation of the provision of such care.

4. The mental health care unit shall be administered by a psychiatrist or Ph.D. psychologist in coordination with the Chief of Medical Services.

IX. *Classification*

1. Defendants shall establish within ninety days of this order a classification system which shall include:

a. Due consideration to the age; offense; prior criminal record; vocational, educational and work needs; and physical and mental health care requirements of each prisoner;

b. Methods of identifying aged, infirm, and psychologically handicapped or physically disabled prisoners who re-

quire transfer to a more appropriate facility, or who require special treatment within the institution;

c. Educational, vocational, rehabilitative, training, religious, recreational and work programs specifically designed to meet the needs of the classification system;

d. Methods of identifying those prisoners for whom pre-release, work release or school release are appropriate;

2. All persons currently incarcerated at the NHSP shall be classified pursuant to the classification plan mandated by this order within six months. The classification of each prisoner shall be reviewed every six months thereafter.

3. Quarantine status for the purpose of admission, orientation and classification shall not exceed fourteen days, and, while in such status, each prisoner shall receive adequate exercise, recreation, food, health and hygiene services.

4. Defendants shall establish reasonable entrance requirements and rational objective criteria for selecting prisoners to participate in work, vocational training or educational or recreational programs; such criteria may be a part of the general classification system;

5. Defendants shall hire an outside expert in classification to aid in the planning of and the implementation of a classification system.

X. *Protection From Violence*

Defendants shall make reasonable efforts, including classification, housing, and monitoring, to segregate prisoners who engage in violence and aggression.

XI. *Work Opportunities*

1. Each prisoner at NHSP shall be afforded the opportunity to work at a useful job. No prisoner shall be idle or on a status whereby he has to await a job assignment longer than fourteen days.

2. No prisoner, who by virtue of age, physical or mental incapacity cannot work, shall be required to work; but he shall have the opportunity to participate in all other vocational training, educational or recreational programs commensurate with his physical or mental ability.

3. Defendants, prior to removing a prisoner from a job and placing him in a non-working status, shall afford him full due process procedures as set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); provided that when a prisoner's presence on the job presents a threat to institutional security, these procedures shall be invoked within five days after his removal from his job. This shall not apply to transfers between jobs.

XII. *Vocational Training*

1. Each prisoner shall have an opportunity during the period of his incarceration to learn a skill(s) which is marketable in New Hampshire.

2. Defendants shall provide suitable vocational training programs designed to teach such skills and shall hire the necessary staff for at least six productive, meaningful vocational training programs. Suggested vocational training programs include formal vocational training in: laundry operation; mechanical services; crafts; clerical, nursing, business, and office training; food services; plumbing; electrical, radio and TV repair; masonry; carpentry; welding; sheet metal work; computer operations; and, any other training programs which are designed to teach a skill(s) marketable in New Hampshire.

3. Defendants shall, within sixty days of the date of this order, survey the prisoners to determine their interest in vocational training programs and, in establishing the programs, shall take into consideration the prisoners' interests.

XIII. *Services and Programs*

1. Each prisoner who needs and desires it shall be given opportunities to participate in the services and programs offered at the prison.

2. The following services and programs shall be instituted in a meaningful and effective manner:

 a. Religious programs for recognized faiths, either separate or interdenominational;

 b. Educational programs which shall, at least, include educational testing, remedial courses, GED, and access to an adequate library;

 c. Pre-college and college level courses or, in the alternative, state funded college level correspondence courses;

 d. Leisure time activities which shall provide a range of choices to prisoners such as handi-crafts, art work, table games, and movies;

 e. Outdoor and indoor sports and recreation the year round;

 f. Treatment programs coordinated with the Chief Medical Officer and the Mental Health Unit to include group and individual counseling and therapy.

3. Pre-release prisoners shall be assisted in obtaining employment, educational and/or vocational training opportunities and shall be assisted in setting up a post-release program.

4. Defendants shall hire additional teachers and other necessary staff to accomplish the above.

5. Defendants shall hire a recreation director to organize and oversee the recreational, sports, and exercise programs.

6. Defendants shall provide space, facilities, and equipment necessary to accomplish the above.

## XIV. *Visitation*

1. Defendants shall allow each prisoner to receive at least two social visits per week. Social visits are visits by family members, friends, and associates, and do not include visits by attorneys, law enforcement personnel, prospective employers, teachers, or others with whom consultation is necessary for pre-release arrangements or to continue an approved rehabilitation program or those whose business is otherwise official.

2. Defendants shall not arbitrarily or capriciously deny visits to prisoners. Visitation privileges may be denied or restricted only in accordance with the regular disciplinary procedures. Such restrictions may not unduly interfere with a prisoner's association with his immediate family. Total withdrawal of visitation privileges or restrictions on visitation with immediate family members shall last no longer than thirty days.

3. Defendants shall deny a particular visit or visitor only if the visit or visitor poses a clear and present danger to the security of the institution or to any person in the institution. Both the inmate to be visited and the visitor shall be notified and given the underlying reasons for the denial and shall be given an opportunity to respond.

4. Defendants shall improve the visitation facilities to include:

 a. Additional seating capacity which shall include chairs, couches and similar furniture arranged so as to provide some privacy;

 b. Separate and private area for attorneys;

 c. Outdoor area for trustees and other approved prisoners.

## XV. *Mail*

1. Defendants shall continue to implement and enforce their present mail regulation, SOP # 81, 4/16/76, with the following exceptions:

 a. The institution may inspect incoming and/or outgoing *privileged* mail of certain inmates if the individual is suspected of attempting to escape or introduce contraband into the prison *only* in compliance with the procedures outlined in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), or with the requirements of the Fourth Amendment.

 b. Prisoners may correspond with any person unless the Warden or his designated agent determines that such

correspondence threatens the life or the security of any individual at NHSP or the institution or unless the Warden and the Chief of Medical Services determine that such correspondence will cause severe psychiatric or emotional disturbance to the inmate.

2. Defendants shall not copy any incoming or outgoing correspondence except in conformance with the procedures outlined in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), or with the requirements of the Fourth Amendment.

### XVI. *Harassment*

Defendants shall not harass or in any way interfere with plaintiff Laaman's, or any other prisoner's right to access to the courts.

SO ORDERED.